ULMER, Linda L.

v.

HARSCO CORPORATION.

Appeal of Linda ULMER.

No. 88–5827.

United States Court of Appeals,
Third Circuit.

Argued March 3, 1989.

Decided Sept. 1, 1989.

Michael D. Fishbein (argued), Levin, Fishbein, Sedran & Berman, Philadelphia, Pa., for appellant.

John C. Unkovic (argued), Robert B. Hoffman, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee.

Before HIGGINBOTHAM, STAPLETON and COWEN, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

This case arose out of a class action suit challenging an employer-plan administrator's decision to deny severance benefits to a group of employees terminated as that employer's employees as a result of that employer's sale of the division in which they worked as a going business. The district court granted summary judgment to the employer-defendant. Because the district court applied an unreasonable interpretation of the language of the plan, and because this error was outcome determinative, we will reverse the grant of summary judgment and remand to the district court for further proceedings consistent with this opinion.

### I.

Harsco Corporation is a diversified business with more than fifteen divisions. Joint Appendix ("Jt. App.") at 444 (magistrate's summary of "undisputed facts"). The consequences of the sale of one of these divisions, the Quaker Alloy Casting Division ("Casting Division"), as a going business is the issue here.

In December 1981, the Casting Division's management issued a written policy regarding severance pay for its salaried employees. Jt. App. at 445. The severance pay fund was to be funded from the general assets of Harsco. The Severance Pay Policy ("Plan") became effective on January 1, 1982, id., and it was an "employee welfare benefit plan" within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), 88 Stat. 829, as amended, 29 U.S.C. § 1001 et seq. Jt. App. at 446.

Harsco announced the terms of the policy to the employees of the Casting Division. These terms became part of the terms of their employment. Id. at 445. The plan was never amended or modified. Id. The plan provided that:

> To further our concept of career employment, the Company will take all practical steps to provide continuing employment, including attempts to arrange transfers if work becomes unavailable at the individual's normal workplace.
>
> However, occasions may arise where the Company will be unable to continue the employment of certain people or groups of people. In these instances, when employment is terminated, the Company will make a reasonable effort to assist such person or persons in securing employment elsewhere and will make

severance payment according to the following rules:

## A. ELIGIBILITY FOR SEVERANCE PAY

All permanent salaried personnel are eligible for payments under this policy, except in cases of voluntary resignation not initiated by the Company, discharge for cause, and where other Company policies govern, such as death, disability, retirement and military leave.

Jt. App. at 449–50. In the situation at issue here, no "other Company policies" govern that might preclude the payment of severance benefits. *Id.* at 450.

Joseph Kasprzak ("Kasprzak"), the Director of Human Services for the Casting Division, largely drafted the severance pay policy. Harsco's central management subsequently approved the terms of the policy. *Id.* at 445. In developing and promulgating the policy, the question of whether severance benefits would be paid in the event that Harsco terminated its salaried employees incident to the sale of the assets of the Casting Division as a going concern was not considered. Jt. App. at 450. Specifically, Kasprzak never considered this question in drafting the agreement. Jt. App. at 457 n. 6.

Harsco does not have a single, company-wide severance policy. Some divisions offer no severance benefits, Jt. App. at 33; others have benefit plans that differ from the one at issue here, Jt. App. at 43–48 (collecting several different Harsco severance pay plans with terms different from those governing that of the Casting Division). However, Harsco has been consistent in the treatment of the payment of severance benefits following the divestitures of portions of its business that it has been involved in over the course of the past decade. It has made severance payments in the following instances: (1) when employees were terminated by Harsco and not hired by the purchasers; (2) when employees were hired by purchasers but subsequently terminated; and (3) on an *ad hoc* basis to key managerial personnel to induce them to remain with Harsco during the wind down of operations at a given Harsco

entity. Jt. App. at 451. Harsco has never made severance payments to workers when the sale of an operating plant was consummated in such a way as to provide continued employment for the employees. Jt. App. at 451. The magistrate found that, to the extent that he had considered Harsco's past practice as an employer in comparable situations or common industry usage, that these factors were not shown to be favorable to the plaintiffs. Jt. App. at 457–58.

On January 24, 1986, Harsco agreed to sell the Casting Division to Quaker Alloy, Inc., a newly formed corporation. The principals of this corporation were former officers and managers of the Casting Division and two outside investors. *Id.* at 446. Section 4.3 of the Sale of Assets Agreement specifically provided that Quaker would hire most of the Casting Division's salaried employees "so that there [would be] no interruption in the continuity of employment." *Id.* at 448. The sales agreement further provided that Harsco would pay severance benefits to any such salaried worker hired by Quaker who was permanently laid off within twelve months of the closing date of the sale. *Id.* No claims for such severance benefits following lay off are before us now.

In addition, Exhibit G to the sales agreement set out Harsco's position as to what severance pay liability would arise as a result of the sale. Jt. App. at 448. In accordance with Harsco's general policy, Exhibit G provided that Harsco would pay employees who were not offered jobs with Quaker Alloy severance pay. Employees who were offered jobs with Quaker Alloy and accepted them, but were terminated within twelve months, would receive pro-rated severance pay. Finally, employees who were offered jobs with Quaker Alloy would not receive severance pay if they either declined the offer or remained with Quaker Alloy for at least a year. A copy of Exhibit G was sent to all Casting Division employees. Jt. App. at 448. Severance payments were made or denied to former Casting Division employees on the basis of this policy. *Id.*

Accordingly, on March 14, 1986, shortly after the sales agreement had been negotiated, Harsco's Vice President for Employee Relations, Emile deCoen ("deCoen"), wrote the salaried employees of the Casting Division describing the company's interpretation of the effect of the sale upon their employment and eligibility for severance benefits. *Id.* at 446–47. DeCoen stated that "under the agreement with the [acquiring] company, Harsco Corporation's employment of its Quaker employees will terminate effective as of the closing date of the purchase." DeCoen's letter further stated that Harsco would not make any severance payments to those of its salaried employees who were offered employment by Quaker Alloy. *Id.*

The correctness of this interpretation of the severance pay policy is the central issue in this case. Harsco has asserted throughout this litigation that no severance pay is owing under the severance plan. Slightly more than five months after the date of the sale, Linda L. Ulmer ("Ulmer"), on behalf of the class of the Casting Division's former employees who were denied severance payments on the basis of the continuity of their employment, filed this suit challenging this interpretation of the plan. Jt. App. at 467.

The closing date for the purchase of the Casting Division was March 31, 1986. As of that date, all class members ceased to be employed by Harsco. *Id.* at 447. If they wished to become employed by Quaker Alloy, the acquiring company, they were required to submit an application for employment. If that application was accepted, they were then required to execute an employment contract with Quaker Alloy, Inc. *Id.* Such contracts had not been required by Harsco. *Id.*

On April 1, 1986, the day after the closing, the class members first went to work as Quaker Alloy employees. Although they held the same jobs, shifts, wages, and supervisors as on the previous day, *id.*, the terms of their employment were significantly worsened in the following six respects:

1. The new company eliminated all severance benefits;
2. vacation time was reduced;
3. the employer contribution to the employee's health benefit plan was frozen;
4. disability coverage was changed;
5. the number of paid holidays was reduced;
6. pension, thrift, and 401(K) benefit plans were eliminated altogether; and
7. the tuition reimbursement program in effect at Harsco was also eliminated.

Jt. App. at 454. Plaintiff class argues that these worsened terms constitute the economic loss that indicates that their change in employers was indeed a "substantive economic event" that constituted an economic loss and so entitles them to severance. Appellant's Brief at 21–22.

## II.

The district court noted that the magistrate, in stating that the *Bruch* test meant inquiring whether the decision of the plan administrator had been reasonable, applied the wrong legal standard. Jt. App. at 469 n. 5, *see also* 455 (magistrate's statement of the standard applied). The district court stated that the correct legal standard was *de novo* review, based on the principles governing the construction of contracts between parties bargaining at arms' length. Jt. App. at 469. The *Bruch* standard requires that a reviewing court favor neither the interpretation of the employer nor that of the employees in construing an employee benefit plan. *Firestone Tire and Rubber Co. v. Bruch,* — U.S. —, 109 S.Ct. 948, 954–55, 103 L.Ed.2d 80 (1989). Rather, a reviewing court must engage in *de novo* review unless, as was not true here, "the benefit plan gives the administrator ... discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Bruch,* 109 S.Ct. at 954.

However, in applying the *Bruch* standard, the district court relied on an idiosyncratic definition of the words "workplace" and "entity" that distinguished sharply between the loss of a workplace and the loss of an employer. The central

question here is a question of law—the proper interpretation of a legal instrument—hence our review is plenary. Because we find that the district court construed the language of the plan in an unreasonable fashion, we will reverse the district court's grant of summary judgment.[1]

The district court distinguished sharply between the loss of an employer, which in its view did not constitute the loss of a job and so did not require the payment of severance benefits, and the loss of a "work place," which would have. Jt. App. at 470–71. In the eyes of the district court, when Harsco sold the Casting Division, the employees' workplace remained the same, "only the ownership of that entity changed." *Id.* Accordingly, employees had not been severed from their employment and severance pay was not due.

The district court based its interpretation on two factors. First, the court viewed the Casting Division as a "distinct entity," Jt. App. at 471, which led the district court to conclude that "severance pay was only intended to cover the circumstance in which an employee's relationship to the Casting Division as an *entity* was severed." Jt. App. at 471 (emphasis in the original). Second, the district court relied in part on the language of the Plan, which specified that Harsco would attempt to provide " 'continuing employment, including attempts to arrange transfers if work becomes unavailable at the individual's normal workplace.' " Jt. App. at 470 (quoting the Casting Division Severance Pay Plan). The district court interpreted this language as creating "a hierarchy of methods" for achieving "continuing employment": (1) maintenance in the employee's "normal workplace", (2) intra-firm transfer and (3) attempts to assist the employee in securing work elsewhere and severance payments. For the district court, Quaker Alloy was the Casting Division's employees' "normal workplace" and hence looking further down in the hierarchy for alternative methods such as severance pay was unnecessary.

■ We disagree with this interpretation on two bases. First, "continuing employment" is properly construed to mean employment with *Harsco's* Casting Division, not with an acquiror of the Casting Division's assets/operations. The Plan states that "[t]o further our concept of career employment, the Company will take all reasonable steps to provide continuing employment ...". If the district court's interpretation were correct, then it would follow that Harsco's Casting Division's concept of "career employment" as outlined in the Plan would be satisfied by employees working for a different employer/owner, albeit at the same plant. We do not think that such a construction comports with the plain meaning of the Plan. Furthermore, in the sentence following the next reference to "continuing employment" ("[h]owever, occasions may arise where the Company will be unable to continue the employment of certain people ..."), the Plan states "[i]n these instances, when employment is *terminated*, the Company will make a reason-

1. We note that the parties briefed the issue of whether the district court had jurisdiction. The appellee argued that the district court's judgment in favor of Harsco should be affirmed on the grounds that the plaintiff class had failed to sue the proper party, to wit, the Plan rather than Harsco. Appellee's Brief at 14–15. *See also* Appellants' Reply Brief at 2 (arguing that Harsco is a proper party "because Harsco is the Plan administrator and becaue [sic] the Plan is funded from its general assets, it and the Plan share a complete identity."). We note that, while plaintiffs' Amended Complaint named Harsco as defendant but not the Plan, this omission was not fatal. Harsco served the Plan in a dual capacity: as the sponsor of the unfunded Plan whose general assets are the source of the payment sought, Jt. App. at 445, 467, and as the

Plan administrator. The complaint not only names Harsco as the defendant, but goes on to identify Harsco as the administrator of the Plan, Jt. App. at 386 (Complaint, Para. 12) and to allege that Harsco violated ERISA in "administering" the Plan, Jt. App. at 386 (Complaint, Para. 13) and that its refusal to pay severance benefits was not in accordance with the terms of the Plan, Jt. App. at 389 (Complaint, Para. 28). The complaint asks for a declaratory judgment that Harsco violated ERISA in administering the Plan and for an injunction directing Harsco to pay the benefits sought. Jt. App. at 391 (Complaint, § V.(b) & (c)). Under these circumstances, we hold that Harsco had notice that it was being sued in both its capacity as plan sponsor and its capacity as plan administrator.

able effort to assist ... and will make severance payment...." (emphasis added). Thus, it is apparent that "continuing employment" is ended, and severance payment is due, when the employee is terminated from Harsco's Casting Division, not when s/he is moved from the relevant work environment.

■ Similarly, we find the district court's interpretation of "normal workplace" unreasonable, and its distinction between an "entity" and the managers who control it unconvincing. Both of these interpretations constitute improper constructions of the language of Harsco's Plan. At the conceptual level, from the standpoint of an employee, the owners define the nature of the "entity" employees work for. With the significant downgrading in the fringe benefits, the new owners of Quaker Alloy did so and the "entity" that they defined was a different, less paternalistic and more individualistic employer than Harsco's Casting Division had been.

At the level of contract interpretation, plaintiffs argue cogently that the preservation of the relationship with the workplace rather than with the employer is not in fact what the Plan seeks to protect. Were the district court's workplace theory correct, Harsco would be obliged to pay severance benefits when it transferred a worker from one division to another, an occurrence which the district court found did not require the payment of severance pay, Jt. App. at 470, and which the Plan itself specifies as an alternative to the payment of severance. In such a transfer, the employer-employee relationship is preserved, though the workplace-employee relationship is not.

This conclusion is supported by the language in the first paragraph of the Plan as quoted above which clearly contemplates transfers to maintain an employee's "continuing employment" with Harsco's Casting Division. Since transfer to another task/office at Harsco's Casting Division would apparently preserve the employee's "continuing employment," the district court's conclusion that severance pay is due only when the employee is moved from

his/her location, task, and supervisors, is incorrect. Finally, the last sentence of the second quoted paragraph of the Plan states that when continuing employment is not possible, "the Company will make a reasonable effort to assist such person ... in securing employment elsewhere ... ." If "continuing employment" meant with another owner, albeit at the same plant, then Harsco would have an obligation to help its former employees obtain positions elsewhere when they were either terminated by the acquiror years later or transferred to another of the acquiror's plants. The latter is persuasive evidence that the Plan does not seek principally to protect a workplace-employee relationship, and no language in the Plan affirmatively supports the district court's "work place" theory. Moreover, the Plan's specification of such intra-firm transfers as one alternative to severance payments also undercuts the district court's characterization of the Casting Division as the distinct entity with which an employee's relationship must be severed before severance payments are owing.

Finally, viewing the Casting Division and Quaker Alloy as a single entity misdescribes this specific situation. The plaintiff class had to fill out new employment applications and, when offered a position, they had to sign new employment contracts. Harsco informed them that they were "terminated" as of the date of the sale. Jt. App. at 177 (letter to salaried employees concerning Harsco's severance pay intentions a result of the sale of the Casting Division). Had the Casting Division's management, which drafted the Plan, viewed the protection of the employee's relationship with her workplace as not constituting severance, it would not have employed language so clearly indicating that the employees had been severed from Harsco.

■ In sum, while the language of the Plan is general, it is not ambiguous on its face. It clearly states that "where employment is terminated"—the language Harsco used to describe its action in its letter to employees—severance would be paid. Jt. App. at 449. Since the Plan gives several

exemptions to this rule—"death, disability, retirement and military leave," Jt. App. at 450—one may assume under the principle of *expressio unius exclusio alterius* that other exemptions such as going concern sales were not intended. The "lead draftsman and developer" of the Plan, Jt. App. at 121, Kasprzak, never considered the question of severance pay in the context of a going concern sale, Jt. App. at 122, cf. 457 n. 6. The President of the Casting Division, John C. Engeswick, who was charged with administering the Plan, Jt. App. at 365, testified that the severance plan was meant to compensate any employee who was "laid off," "[i]f the fellow was lucky enough to land a job the next day, more power to him," Jt. App. at 308, *see also* Jt. App. at 156 (Kasprzak's testimony that severance pay was paid regardless of whether a terminated Harsco employee immediately secured other employment). *But see* Jt. App. at 38–39 (Martin Pfautz, Vice President and Comptroller of the Casting Division during the period when the Plan was drafted, stating in an affidavit that the Plan was not intended to provide severance payments in the context of a going concern sale). Thus, in the eyes of the drafter of the Plan and the corporate officer responsible for administering it, the fact that the terminated Harsco employees were immediately reemployed did not disable them from receiving severance payments. The district court's grant of summary judgment in favor of Harsco on that basis was in error.

We reach this decision despite the fact that many of the other federal courts have ruled on this issue prior to *Bruch* and, at that point, ruled against those seeking severance payments. These cases both were decided under the more deferential arbitrary and capriciousness standard and also in many cases deal with plans providing significantly more discretion to the plan administrator than does the one at issue here or otherwise establishing a significantly different severance pay regime than that of the Casting Division. *See Young v. Standard Oil (Indiana)*, 849 F.2d 1039, 1040–41 (7th Cir.1988) (because Amoco owes no fiduciary duty to the employees whose severance plan it administers, it is not arbitrary and capricious secretly to change the plan just before the sale of their workplace in order to exclude these employees from severance benefits; original plan had provided that groups of employees could be excluded from severance benefits at the discretion of managers); *Schwartz v. Newsweek, Inc.*, 827 F.2d 879 (2d Cir.1987) (each Newsweek employee of a magazine was given two options: (1) employment with the new owner of the magazine with loss of Newsweek severance benefits, or (2) seeking continued employment within the Newsweek organization with severance benefits if that was not available; not arbitrary and capricious to deny severance benefits to plaintiffs who accepted employment with the new owners and sought severance pay when new owners went bankrupt ten months later); *Blakeman v. Mead Containers*, 779 F.2d 1146, 1151 (6th Cir.1985) (decision to deny severance benefits not arbitrary and capricious where company had practice of denying severance benefits in connection with the sale of a going business where employees were rehired and where severance plan specifically stated that it was flexible and that managers were to make case-by-case determinations); *Anderson v. Ciba–Geigy Corp.*, 759 F.2d 1518 (11th Cir.1985) (plan specifically exempted "special situations" from severance pay; company's decision that a sale of a going business with continued employment provided was a special situation was not arbitrary and capricious); *Sly v. P.R. Mallory & Co., Inc.*, 712 F.2d 1209 (7th Cir.1983) (award of severance benefits discretionary and severance pay plan found by the district court to be intended to be an unemployment benefit). Because the Supreme Court has supplied a different standard of review since these cases were decided, and because many of these cases involve plans that give their administrators significantly more discretion than did the plan at issue here, we do not find these cases to be persuasive authority.

### III.

For the reasons discussed above, the judgment of the district court granting

summary judgment in favor of the defendants will be reversed, and this case will be remanded for further proceedings consistent with this opinion.