### In re OLD ELECTRALLOY CORPORATION f/k/a and f/d/b/a Electralloy Corporation, Debtor.

**Richard W. ROEDER, Trustee, Movant,**

v.

**UNITED STEELWORKERS OF AMERICA, Respondent.**

**Bankruptcy No. 91–00062.
Motion No. 92–31.**

United States Bankruptcy Court,
W.D. Pennsylvania.

May 23, 1994.

See also, 164 B.R. 501.

Guy C. Fustine, Erie, PA, for trustee.

Melvin L. Vatz, Pittsburgh, PA, for United Steelworkers of America.

*Opinion*

WARREN W. BENTZ, Chief Judge.

*Introduction*

Old Electralloy Corporation f/k/a and f/d/b/a Electralloy Corporation ("Debtor") operated as a specialty steel manufacturer with plants located in Oil City, Pennsylvania, Kokomo, Indiana and Frazier, Pennsylvania. The United Steelworkers of America ("USWA") is the collective bargaining representative of the hourly employees at the Debtor's Oil City location.

Before the Court is the objection Richard W. Roeder, Esq. ("Trustee") to the following claims which the USWA filed on behalf of its members:

| Claim No. | Date Filed | Short Description | Amount |
|---|---|---|---|
| 731 | 6/21/91 | Priority Wages and Benefits | $ 8,041.20 |
| 828 | 8/26/91 | Administrative Wages and Benefits | $ 760.40 |
| 829 | 9/3/91 | Priority Wages and Benefits (Amends Claim No. 731) | $168,149.60 |
| 831 | 11/26/91 | Severance pay claim | $344,740.12 |

Claim No. 731 as amended by Claim No. 829 includes claims for vacation pay. On December 20, 1991, the Trustee filed Motion No. 91–1908 which set forth the Trustee's analysis of the amount due employees for vacation pay. The Trustee objects to Claims 731 and 829 to the extent that the amounts claimed are inconsistent with the Trustee's analysis. At issue is the appropriate method to calculate the vacation pay claims which requires an interpretation of the provisions of the collective bargaining agreement ("Labor Agreement") between the Debtor and the USWA. The Trustee further objects to Claim 829 on the basis that the claim constitutes a new claim which was late-filed after the bar date.

Claim number 831 asserts an unsecured claim in the amount of $344,740.12 for severance pay which the USWA claims is due under the Labor Agreement. The USWA has subsequently asserted that a portion of the severance pay claim is entitled to administrative priority. The Trustee responds that the USWA members are not entitled to a claim for severance pay; that claim number 831 was late-filed after the bar date; and that even if deemed to be timely filed, the severance pay claim is not entitled to administrative priority.

On July 25, 1991, the USWA filed Motion No. 91–1141 to DETERMINE ADMINISTRATIVE CLAIM AND TO COMPEL FILING OF GRIEVANCES. The USWA sought the allowance of an administrative claim for meal money due under the Labor Agreement to employees who worked more than 10 consecutive hours in a day. The parties agreed to handle the matter by the filing of a proof of claim. Claim number 828 was filed August 26, 1991, asserting an administrative claim in the amount of $760.40 for meal allowances. The Trustee asserts that the Labor Agreement was never accepted by the Trustee and thus no administrative claim is due.

By agreement of the parties, the matter was submitted to the Court for consideration on the pleadings, the stipulations of fact and briefs, and the deposition of Diann O'Dell.

*Facts*

The parties have stipulated to the relevant facts. From the STIPULATION OF FACTS, we derive the following.

The Debtor filed its voluntary Petition under Chapter 7 of the Bankruptcy Code on January 29, 1991. On January 30, 1991, Richard W. Roeder, Esq. was appointed Trustee. Among the operations of the Debtor was the Steel Division in Oil City, Pennsylvania ("Steel Division").

On February 7, 1991, an Order was entered permitting the Trustee to continue to operate the Steel Division for 60 days under 11 U.S.C. § 721. Subsequently, the Trustee's authority to operate the Steel Division was extended. The authority continued until the Steel Division was sold. The Trustee operated the Steel Division as an ongoing concern and continued to employ hourly employees represented by the USWA because the Steel Division assets were more valuable as part of an ongoing concern.

The USWA represented hourly employees of the Steel Division. The Debtor was a party to a Collective Bargaining Agreement with the USWA, dated November 1, 1987 which expired on September 30, 1990. The Debtor and the USWA negotiated a further contract covering the period from October 1, 1990 through September 30, 1993 ("1990 Agreement") which was never signed. Both agreements contain the same relevant provisions and we will use the term "Labor Agreement" to refer to the operative contract (as hereinafter discussed).

On March 28, 1991, the Court granted the Trustee a 60–day extension for the purpose of either assuming or rejecting executory contracts and unexpired leases, including any collective bargaining agreement between USWA and the Debtor. On May 31, 1991, the time was extended an additional 60 days until August 1, 1991.

The Trustee extended the time to assume or reject and attempted to comply with the 1990 Agreement to preserve his right and ability to cure and assign the agreement if a purchaser of the Debtor's assets wanted to take such an assignment.

By Order dated June 19, 1991 at Motion No. 91–708E, the Trustee sold the assets of

the Steel Division to G.O. Carlson, Inc. ("Carlson") for $8,332,960. The Trustee suspended operations at the Steel Division on or about July 4, 1991, to take inventory over the weekend in accordance with the Carlson sale contract. The Carlson sale closed on Monday, July 8, 1991 and Carlson commenced operations at the Steel Division on July 9, 1991.

The Trustee took no action prior to August 1, 1991 to either affirmatively assume or reject the Labor Agreement. As of August 1, 1990, all of the Debtor's contracts and leases which were not assumed (including the Labor Agreement) were deemed rejected by operation of law.

The Labor Agreement contained a provision for severance pay. The bar date for filing proofs of claim was June 24, 1991. On September 18, 1991, the USWA filed a Motion for leave to file a claim for severance pay. On October 22, 1991, the USWA was granted leave to file such a claim, without prejudice to any defense which the Trustee may have to the claim. On November 25, 1991, the USWA filed its severance pay claim, Claim number 831.

Carlson recognized the USWA as the collective bargaining agent of the hourly employees when it began operation of the Steel Division. Carlson offered the Debtor's active employees as of May 31, 1991 employment effective July 9, 1991 with the same wage rate as paid by the Trustee. Carlson further recognized seniority for purposes of vacation eligibility and for vesting in the Carlson pension/profit sharing plan.

Carlson placed the Debtor's USWA members who were on lay-off status on a "priority" list for purposes of recall. Carlson retained 50 of the Debtor's active USWA employees as of July 9. Sixty-four inactive employees, those on sick leave, National Guard duty, Workmen's Compensation and on lay-off were retained on the "priority" list. Carlson had recalled seven employees from the priority list as of December, 1993.

The USWA and Carlson entered into a Collective Bargaining Agreement dated April 1, 1992 ("1992 Agreement"). The 1992 Agreement recognizes seniority for those employees on active duty as of July 9, 1991 based on their first employment with the Debtor or any predecessor of the Debtor.

On June 21, 1991, the USWA filed Claim number 731 for priority wages and benefits. On September 3, 1991, the USWA filed Claim number 829 as an amendment to Claim number 731, increasing the amount to include claims for vacation pay under the Labor Agreement.

Prior to the filing of the Debtor's bankruptcy Petition, the Debtor's USWA employees were paid for all vacation time not taken in 1990, which represented vacation earned in 1989–1990. USWA employees were required by practice of the Debtor to take all vacation before the end of the calendar year. Vacation time could not be accumulated on a year-to-year basis.

In all years subsequent to the first year of employment in which an employee first became eligible for vacation, the Debtor's practice was to allow the employee to take vacation at any time during the calendar year. In those years in which the number of weeks of vacation increased as a result of accumulated years of service, the employee could only take the additional weeks of vacation time after the employee's anniversary date of employment and before the end of the calendar year. The Debtor's practice was to determine the amount of vacation payable for the prior calendar year for each employee in January of the new calendar year. The Debtor accrued the vacation pay on the prior year's financial statement.

No payments for vacation pay have been made to employees for vacation earned in 1990–1991. Such time would have been taken before December 31, 1991. Neither the Debtor nor the Trustee granted paid vacation time or paid for unused vacation time after the bankruptcy filing.

### I. Severance Pay (Claim No. 831)

#### A. Timeliness of Claim

■ The within Chapter 7 bankruptcy case was filed on January 29, 1991. The bar date fixed for filing proofs of claim was June 24, 1991. On September 18, 1991, the USWA filed its MOTION TO ALLOW LEAVE TO FILE CLAIM FOR SEVERANCE PAY.

By Order dated October 22, 1991, the USWA was granted leave to file a claim for severance pay "without prejudice to any defense thereto which the Trustee may raise." The USWA filed Claim No. 831 which asserts a claim for severance pay on November 26, 1991.

The Trustee presently objects to Claim No. 831 as a late-filed claim. The USWA asserts that its severance pay "claim was not ripe prior to the bar date, as the sale [of the Debtor's Steel Division assets] did not occur until after the bar date." The USWA further asserts that the Labor Agreement was not rejected prior to the bar date. Accordingly, it is the USWA's position that the severance pay claim could not have been made prior to the bar date.

Fed.R.Bankr.P. 3002 provides the time frame for the filing of a proof of claim in a Chapter 7 case. "[A] proof of claim shall be filed within 90 days after the first date set for the meeting of creditors called pursuant to § 341(a) of the Code," unless one of six exceptions is applicable. Fed.R.Bankr.P. 3002(c). One of those exceptions is that "[a] claim arising from the rejection of an executory contract ... may be filed within such time as the court may direct." Fed. R.Bankr.P. 3002(c)(4).

In a Chapter 7 proceeding, if the Trustee neither assumes nor rejects an executory contract within 60 days after the order for relief, then the contract is deemed rejected, unless the court grants additional time for the Trustee to elect whether to assume or reject. In this case, the Trustee was granted extensions of time until August 1, 1991 to assume or reject the Labor Agreement.

Prior to August 1, 1991, the USWA could not proceed on its severance pay claims because the Trustee did not act affirmatively to either accept or reject the Labor Agreement. Prior to rejection, a claim did not exist; the Labor Agreement had not been breached.

When the Labor Agreement was deemed rejected on August 1, 1991, the USWA was entitled to file its claim "within such time as the court may direct." Fed.R.Bankr.P. 3002(c)(4). The court was not requested to and did not fix such a time and thus the USWA's time for filing its claim has not expired. On September 18, 1991, the filing of USWA's MOTION TO ALLOW LEAVE TO FILE ITS SEVERANCE PAY CLAIM was a timely pursuit of its rights. Accordingly, we find that Claim number 831 was timely filed.

### B. Was the Labor Agreement an Executory Contract Subject to Rejection

■ The USWA asserts that the Labor Agreement was not an executory contract after the Trustee sold the Debtor's operating assets to Carlson. Thus, the USWA asserts that since the contract was no longer executory, it was no longer subject to rejection by the Trustee.

In support of its position, the USWA directs us to *In re Illinois–California Express, Inc.*, 72 B.R. 987, 992 (D.Colo.1987) and *In re Total Transportation Service, Inc.*, 37 B.R. 904, 906–07 (Bankr.S.D.Ohio 1984). In both of those cases, the Chapter 11 debtors had ceased operations and terminated all remaining employees. In *Total Transportation*, after cessation of operations and termination of its employees, the debtor moved to reject its collective bargaining agreement. The Court denied the motion, holding that because there could be no further performance by either party under the contract, the contract was no longer executory.

In *Illinois–California Express*, the Chapter 11 debtor ceased operations and converted its case to Chapter 7. The court held that the debtor's labor agreements ceased to be executory as of the date which the Chapter 11 debtor ceased its operations and terminated its employees because there could be no future performance under the contract.

This case was never a Chapter 11. It was filed as a Chapter 7 and the Trustee was authorized to operate the business. Operation at the Steel Division never ceased. The Trustee ran the operation until the July 9, 1991 sale to Carlson, and Carlson continues to operate the facility. Until August 1, 1991, the date the Labor Agreement was deemed rejected by operation of law, the Trustee could have cured any defaults, assumed the Labor Agreement and assigned it to Carlson. As such, the Labor Agreement was an execu-

tory contract, which was deemed rejected pursuant to § 365(d)(1) on August 1, 1991.

■ The Trustee's rejection of the contract on August 1, 1991 does not render the contract non-existent. The rejection constitutes a breach of the Labor Agreement immediately before the date of the filing of the bankruptcy Petition. 11 U.S.C. § 365(g). In *In re Continental Airlines,* 981 F.2d 1450 (5th Cir.1993), the court held that employees furloughed after the bankruptcy filing were entitled to make claims under the collective bargaining agreement for furlough benefits, even though the contract was subsequently rejected. 981 F.2d at 1460. Similarly, the Trustee's rejection of the Labor Agreement did not extinguish the Debtor's obligations under the severance pay provisions of the agreement or render the severance pay provisions inapplicable as of the date of rejection.

Likewise, the rejection does not relieve the Trustee of his obligations which arise from the period of time during which the Trustee operated the business. The Trustee elected "to receive benefits from the other party to an executory contract pending decision to reject or assume the contract," and "is obligated to pay for the reasonable value of those services, which, depending on the circumstances of the particular contract, may be what is specified in the contract." *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984).

### C. Is the USWA entitled to a severance claim?

■ The Debtor and the USWA were parties to a Collective Bargaining Agreement that was effective from November 1, 1987 until September 30, 1990. The parties negotiated another contract dated October 1, 1990 which covered the period of time from October 1, 1990 through September 30, 1993. The October 1, 1990 contract was never signed. It is unclear which contract applies. However, even if the 1990 contract does not apply, the 1987 contract provides that it renews itself for one-year periods unless either party serves notice otherwise. Apparently, there is no dispute that either the 1987 or 1990 contract is applicable and both contracts contain the same provisions concerning severance, meal allowance, and vacation pay.

Section 16 of the Labor Agreement contains the severance provisions. Section 16(A) provides:

A. Conditions of Allowance

When, in the sole judgment of the Company, it decides to close permanently the plant or discontinue permanently a substantial portion thereof and terminate the employment of individuals, an employee whose employment is terminated either directly or indirectly as a result thereof ... shall be entitled to a severance allowance ...

The Labor Agreement does not address the effect of a sale of the assets as occurred here. When the Trustee sold the assets to Carlson, Carlson recognized the USWA as the collective bargaining representative of the Steel Division employees. Included in the Asset Purchase Agreement between the Trustee and Carlson was a provision for Carlson to hire the current work-force. Carlson offered employment to those employees actively working at the Steel Division at the time of the sale. USWA members on lay-off status were placed on a "priority" list for purposes of recall. The employees were paid the same wage rate and seniority was recognized for purposes of vacation eligibility and for purposes of vesting in the Carlson pension/profit sharing plan. Carlson did not recognize seniority for purposes of severance allowance.

The USWA and the Trustee disagree on whether the language of the Labor Agreement can be interpreted to provide for a severance allowance under such facts.

The Trustee asserts that there was no decision "to close permanently the plant" and "terminate the employment of individuals." The Trustee further asserts that the sale does not result in a severance allowance, particularly when the Steel Division was not closed and the USWA members were offered continuing employment with the buyer. The USWA asserts that a sale constitutes a permanent plant closing and the sale terminated the existing employer-employee relationship,

regardless of continued employment with a successor purchaser.

We look to the applicable law.

"[S]everance pay benefits may be intended to compensate an employee for the possibility of lower salary and benefits even when his or her employment continues without interruption with a new employer." *Kotrosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Employees,* 970 F.2d 1165, 1171 (3d Cir.1992) *cert. den.* —— U.S. ——, 113 S.Ct. 657, 121 L.Ed.2d 583 (1992); *See also Taylor v. Continental Group Change in Control Severance Pay Plan,* 933 F.2d 1227 (3d Cir.1991); *Ulmer v. Harsco Corp.,* 884 F.2d 98 (3d Cir.1989); *Bruch v. Firestone Tire and Rubber Co.,* 828 F.2d 134 (3d Cir. 1987), *rev'd on other grounds,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

In *Bruch,* the Court of Appeals offered some guidance in making such a determination:

> We suggest several principles of contractual construction which we believe will be relevant in the proceedings to come. We begin with several rules of interpretation which aid courts in identifying the intention of parties to a contract.
>
> Some of the cases cited above suggest that there is a practice of paying severance pay whenever employees leave an employer, regardless of whether or not the employees are actually without a job for a time. At the same time, the defendants have cited cases showing that many employers do not pay severance pay unless the employees are in fact without a job. We have no way of telling which—if either—of these cases represents current practice. The district court should attempt to answer that question on remand. See Restatement (Second) of Contracts 202(5) (instructing that "the manifestations of intention of the parties to a promise or agreement are interpreted as consistent ... with any relevant ... usage of trade"). Similarly, the defendants have argued that their own practice with respect to the Firestone Termination Pay plan is that benefits are paid only if employees are without any job when they cease work for Firestone. Plaintiffs have contested this version of Firestone's past practice. In determining

the plan's meaning the district court should take account of such evidence of past practice under the plan. See Restatement (Second) of Contracts § 202(4).[13]

---

[13]. That section provides: Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

Additionally, plaintiffs have pointed to language in a Firestone memorandum which they claim supports their contention that a reduction in force includes any separation of an employee from Firestone regardless of whether or not the employee has another job. This evidence, if credited and if construed as plaintiffs invite the court to construe it, would also support the result for which they contend. See Restatement § 202(5) ("[w]herever reasonable, manifestations of the parties to a promise or agreement are interpreted as consistent with each other").

The district court may also find that, under the common usage in the trade, or under Firestone's past practice, Termination Pay is awarded even if employees remain employed if their compensation drops substantially when the employees cease to work for the employer. Here the parties disagree about whether or not the plaintiffs' compensation after the sale of the Plastics Division is as great as it was before—particularly with respect to benefits, such as provision of Termination Pay. If the district court determines that the award of Termination Pay turns on the difference in the employees' compensation before and after the sale, it should ascertain the scope of any such difference in rate of pay.

It may be, however, that while these canons of construction prove helpful, they do not resolve the case by themselves. That is in part because this is a unilateral contract, and it may be that the parties here simply never agreed on what the term "reduction in force" would mean; if that is so then rules of interpretation designed to help courts identify that intention will not be helpful. The problem facing the district court on remand would then be akin

to the difficulties a court faces when parties omit an essential term. The Restatement instructs that in that circumstance "a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204. If the parties here did not agree on what would constitute a "reduction in force," so that the court cannot enforce their intention, then the court should adopt the most reasonable understanding of the term.

828 F.2d at 147–48.

Footnote 14 provides:

Even in this eventuality, however, the court will be helped in identifying the most reasonable term by the information discussed above relating to the parties' and the industry's past practice and to Firestone's other statements regarding the term's meaning.

828 F.2d at 148 (n. 14).

In *Ulmer v. Harsco Corp.*, Harsco sold its casting division to Quaker Alloy. Harsco refused severance payments to its employees who were offered employment by Quaker Alloy. At the time of the sale, Harsco had in effect the following severance pay policy:

To further our concept of career employment, the Company will take all practical steps to provide continuing employment, including attempts to arrange transfers if work becomes unavailable at the individual's normal workplace.

However, occasions may arise where the Company will be unable to continue the employment of certain people or groups of people. In these instances, when employment is terminated, the Company will make a reasonable effort to assist such person or persons in securing employment elsewhere and will make severance payment according to the following rules:

A. ELIGIBILITY FOR SEVERANCE PAY

All permanent salaried personnel are eligible for payments under this policy, except in cases of voluntary resignation not initiated by the Company, discharge for cause, and where other Company policies govern, such as death, disability, retirement and military leave.

884 F.2d at 99–100.

The day after the sale, Harsco's employees went to work as Quaker Alloy employees. They held the same jobs, shifts, wages and supervisors but suffered a decrease in benefits. *Harsco* at 101.

The Court concluded:

In sum, while the language of the Plan is general, it is not ambiguous on its face. It clearly states that "where employment is terminated"—the language Harsco used to describe its action in its letter to employees—severance would be paid. Jt.App. at 449. Since the Plan gives several exemptions to this rule—"death, disability, retirement and military leave," Jt.App. at 450—one may assume under the principle of *expressio unius exclusio alterius* that other exemptions such as going concern sales were not intended. The "lead draftsman and developer" of the Plan, Jt.App. at 121, Kasprzak, never considered the question of severance pay in the context of a going concern sale, Jt.App. at 122, cf. 457, n. 6. The President of the Casting Division, John C. Engeswick, who was charged with administering the Plan, Jt.App. at 365, testified that the severance plan was meant to compensate any employee who was "laid off," "[i]f the fellow was lucky enough to land a job the next day, more power to him," Jt.App. at 308, *see also* Jt.App. at 156 (Kasprzak's testimony that severance pay was paid regardless of whether a terminated Harsco employee immediately secured other employment). *But see* Jt.App. at 38–39 (Martin Pfautz, Vice President and Comptroller of the Casting Division during the period when the Plan was drafted, stating in an affidavit that the Plan was not intended to provide severance payments in the context of a going concern sale). Thus, in the eyes of the drafter of the Plan and the corporate officer responsible for administering it, the fact that the terminated Harsco employees were immediately reemployed did not disable them from receiving severance payments. The district court's grant of summary judgment in favor of Harsco on that basis was in error.

We reach this decision despite the fact that many of the other federal courts have ruled on this issue prior to *Bruch* and, at that point, ruled against those seeking sev-

erance payments. These cases both were decided under the more deferential arbitrary and capriciousness standard and also in many cases deal with plans providing significantly more discretion to the plan administrator than does the one at issue here or otherwise establishing a significantly different severance pay regime than that of the Casting Division. *See Young v. Standard Oil (Indiana),* 849 F.2d 1039, 1040–41 (7th Cir.1988) (because Amoco owes no fiduciary duty to the employees whose severance plan it administers, it is not arbitrary and capricious secretly to change the plan just before the sale of their workplace in order to exclude these employees from severance benefits; original plan had provided that groups of employees could be excluded from severance benefits at the discretion of managers); *Schwartz v. Newsweek, Inc.,* 827 F.2d 879 (2d Cir.1987) (each Newsweek employee of a magazine was given two options: (1) employment with the new owner of the magazine with loss of Newsweek severance benefits, or (2) seeking continued employment within the Newsweek organization with severance benefits if that was not available; not arbitrary and capricious to deny severance benefits if that was not available; not arbitrary and capricious to deny severance benefits to plaintiffs who accepted employment with the new owners and sought severance pay when new owners went bankrupt ten months later); *Blakeman v. Mead Containers,* 779 F.2d 1146, 1151 (6th Cir.1985) (decision to deny severance benefits not arbitrary and capricious where company had practice of denying severance benefits in connection with the sale of a going business where employees were rehired and where severance plan specifically stated that it was flexible and that managers were to make case-by-case determinations); *Anderson v. Ciba–Geigy Corp.,* 759 F.2d 1518 (11th Cir.1985) (plan specifically exempted "special situations" from severance pay; company's decision that a sale of a going business with continual employment provided was a special situation was not arbitrary and capricious); *Sly v. P.R. Mallory & Co., Inc.,* 712 F.2d 1209 (7th Cir.1983) (award of severance benefits discretionary and severance pay

plan found by the district court to be intended to be an unemployment benefit). Because the Supreme Court has supplied a different standard of review since these cases were decided, and because many of these cases involve plans that give their administrators significantly more discretion than did the plan at issue here, we do not find these cases to be persuasive authority.

884 F.2d at 103–04.

In *Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137 (3d Cir.1993), *cert. den.* —— U.S. ——, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994), Hoechst sold its PVC Division to American Mirrex. The PVC Division employees continued to work in their same positions for American Mirrex. The employees claimed that their employment with Hoechst was severed when the PVC Division was sold and, therefore, they are entitled to severance pay. *Id.* at 1140.

The Hoechst severance pay policy provided:

1. Policy

It is the policy of Hoechst ... to provide separation pay to eligible employees resulting from certain types of involuntary terminations of employment ...

2.1 Eligibility

All regular, full-time, salaried employees ... who are involuntarily terminated from active employment due to

. . . . .

—sale of all or part of a business (where the acquiring or purchasing company does not offer continued employment) are eligible for separation pay.

2.2 All regular, full-time, salaried employees who are terminated by reason of

. . . . .

—any other reason not specified in 2.1 are ineligible for separation pay.

*Id.* at 1141–42.

The court stated that "[i]n light of the parenthetical exclusion within section 2.1, it appears that Hoechst intended to deny severance pay to employees who were offered continued employment with the purchasing company when the division in which they

worked was sold." *Id.* at 1142. The court concluded that the employees were not entitled to severance pay.

Thus, we are left with the task of interpreting the Debtor's severance pay provisions to determine if the sale of the Steel Division to Carlson triggers the severance provisions of the Labor Agreement. Section 16 of the Labor Agreement is silent as to the effect of a sale of the assets of the business.

While the language of the severance pay provisions in the Third Circuit cases cited above is not identical, the common thread in these cases is that the sale terminated the pre-existing relationship between the employer and employee, regardless of continued employment with a successor purchaser, absent a contrary intent. The same rationale applies here. The Labor Agreement expresses no contrary intent and we are directed to no evidence of a contrary intent. At the time of the sale to Carlson, the Debtor's operation permanently ceased and all of the Debtor's employees were terminated. They were no longer employed by the Debtor. Although active employees were shortly thereafter hired by Carlson with substantially the same wages and benefits, the employment was with a different entity. Further, Carlson did not recognize prior service with the Debtor for calculation of severance allowance benefits. Therefore, at least some benefit of the Labor Agreement was lost by USWA members.

We find that cessation of the Debtor's operations and the termination of its employment relationship with its employees upon the consummation of the sale to Carlson triggers the severance pay provisions of the Labor Agreement. All employees who had accumulated the required length of continuous service as of July 4, 1991 are eligible for severance pay pursuant to § 16 of the Labor Agreement.

### D. Administrative Expense Status

■ 11 U.S.C. § 503 provides that there shall be allowed administrative expenses including:

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for servic-

es rendered after the commencement of the case.

11 U.S.C. § 503(b)(1)(A).

The USWA asserts that its severance pay claim is entitled to administrative priority for that portion of the severance pay earned during the Trustee's administration of the estate. The Trustee asserts that he is only obligated to pay for the reasonable value of the services provided. The Trustee asserts that the employees' postpetition wages have been paid in full and that any severance pay claim is treated as a prepetition claim.

The services of those employees still active as of the shutdown of the plant conferred a substantial benefit upon the Trustee. The Trustee desired to operate the Steel Division as an ongoing concern to enhance its value to potential purchasers. He did not reject the Labor Agreement in order to preserve his right and ability to assign the agreement to a prospective purchaser. The continued operation of the Steel Division made possible by the continued labor of the USWA employees enabled the Trustee to consummate the sale to Carlson which brought $8,332,960 to the estate.

■ The Labor Agreement grants severance on termination based upon years of service to the company. When an agreement for severance pay is calculated based upon length of service, as opposed to pay at termination in lieu of notice, administrative priority under 11 U.S.C. § 503(b)(1)(A) is afforded to that portion of the severance pay earned during the administration of the estate. *In re Roth American, Inc.,* 975 F.2d 949 (3d Cir.1992); *In re Public Ledger,* 161 F.2d 762 (3d Cir.1947). The Trustee was appointed on January 30, 1991. The employees worked for the Trustee until July 4, 1991, a period of 156 days. The employees' compensation package was not limited to wages, but also included other benefits, including the accrual of severance allowance. The Trustee is therefore obligated to the USWA members for that portion of severance pay earned during the period of his administration. This amount is entitled to administrative priority under § 503. This amount is determined by the formula 156/Total Service Days × Total Severance Claims. The balance of the severance claims are prepetition claims.

■ The prepetition portion of the severance pay claim is a third priority claim, in addition to wages and vacation pay, up to $2,000 per person, to the extent that severance pay was earned within the 90 days prior to bankruptcy. 11 U.S.C. § 507(a)(3). The remainder of the severance pay claims are general unsecured claims.

## II. Vacation Pay (Claim No. 731 as Amended by Claim No. 829)

### A. Timeliness of Claim No. 829

■ As to lateness, the Trustee states in Count I of his Objections to Claims at ¶ 18:

The Trustee will treat Claim No. 829 as an amendment to Claim No. 731. Otherwise, Claim No. 829 would be objectionable as late filed.

The Trustee goes on in ¶ 19 to state:

Nevertheless, the Trustee objects to Claim Nos. 731 and 829 to the extent that they are inconsistent with the Trustee's objections to claims made by former employees and limited motion for authority to pay the former employees at Motion No. 91–1908E.

In its answer to the Trustee's Objection at ¶ 18, the USWA admits that "Claim No. 829 is an amendment to Claim No. 731, and is, therefore, not objectionable."

In the Trustee's Brief in Opposition to Respondent's Claims for Severance Pay and Vacation Pay, the Trustee asserts that the USWA's "claim for vacation pay constitutes an improper, new claim filed after the bar date."

The bar date for filing proofs of claim was June 24, 1991. On June 21, 1991, a claim (Claim No. 731) for priority wages and benefits was filed by the USWA. Stipulation of Facts, ¶ 25.

On or about August 8, 1991, the USWA filed a Motion for Leave to Amend Claim No. 731 to include claims for vacation pay. The USWA's Motion was granted by Order dated August 22, 1991, which preserved the Trustee's right to object on any available ground.

On September 3, 1991, the USWA filed an amendment to Claim No. 731 at Claim No. 829, representing claims for vacation pay.

From the initial pleadings, it appears that the Trustee and the USWA agreed that Claim 829 was a proper amendment to Claim 731. Only subsequently has the subject of late filing arisen. In any event, we find that the amendment is a proper, timely-filed amendment to the original claim.

The law concerning the requirements for the late filing of a proof of claim in a Chapter 7 case was succinctly set forth in *In re Walls & All, Inc.*, 127 B.R. 115 (W.D.Pa.1991):

It is well settled that, absent contrary equitable considerations or prejudice to the opposing party, amendments to proofs of claim should be freely permitted. *See [In re] Owens*, 84 B.R. [361] at 363; *In re W.T. Grant Co.*, 53 B.R. 417, 420 (Bankr. S.D.N.Y.1985). "Sometimes the rationale given for permitting claims to be amended is that bankruptcy courts are courts of equity ... Other times, the amendment of a claim has been likened to an amendment of a pleading." *In re Hanscom Retail Foods, Inc.*, 96 B.R. 33, 35 (Bankr.E.D.Pa. 1988) (*quoting In re Ungar*, 70 B.R. 519, 521 (Bankr.E.D.Pa.1987). However, such amendments are to be allowed only where the original claim prompted notice to the court of the existence, nature, and amount of the claim. *In re International Horizons, Inc.*, 751 F.2d 1213, 1217 (11th Cir. 1985); *Owens*, 84 B.R. at 353; *see also AM International*, 67 B.R. 79, 82. Amendments are also permissible to cure defects in a claim already filed, to describe a claim with greater particularity, or to plead a new theory of recovery on the facts of the original claim. *In re Metro Transportation*, 117 B.R. 143, 147 (Bankr.E.D.Pa. 1990); *In re Candy Braz*, 98 B.R. 375, 380 (Bankr.N.D.Ill.1988). Amendments filed after the claims bar date, as in the present case, are to be scrutinized closely to ensure that the amendment is genuine rather than the assertion of an entirely new claim. *Metro Transportation*, 117 B.R. at 147; *see International Horizons*, 751 F.2d at 1215. The deadlines for filing proofs of claims are to be strictly construed to ensure the efficient administration of bankruptcy cases and to provide all parties with finality. *Metro Transportation*, 117 B.R. at 148, *citing In re Pigott*, 684 F.2d 239 (3d Cir.1982); *see In re Vertientes, Ltd.*, 845 F.2d 57, 60 (3d Cir.1988).

*Id.* at 117–18.

The Trustee asserts that since Claim 731 was filed in the amount of $8,041.20 on behalf of five employees for "wages, medical and dental claims" and that the amended claim 829 is filed on behalf of 107 employees for vacation pay in the amount of $168,149.60, Claim 829 is not an amendment, but an entirely new claim which cannot be filed absent a showing of excusable neglect.

While this claim is substantially higher and for more employees than the prior claim, the claim is for benefits arising out of the same Labor Agreement. Perhaps most important, however, is that the vast majority of the employees covered under Claim 829 had previously timely filed their own individual proofs of claim for vacation pay. Therefore, the Trustee, the creditors and the Court were on notice of the existence, nature and the amount of the employees' vacation pay claims. In reality, there is no new claim, just merely the USWA substituting itself as representative of the employees for pursuing the claims. The employees and the USWA do not seek a double recovery; merely a resolution of the manner of calculation of vacation time. Each individual employee could seek such a resolution under the claims filed by the individuals. It is much more efficient and economic for the Court and the estate to resolve the question under the USWA's composite proof of claim.

We will treat Claim 829 as timely filed.

### B. Calculation of Vacation Time

■ The Trustee and the USWA agree that vacation pay earned within 90 days of the filing of the Debtor's bankruptcy Petition represents a priority claim. In dispute is the manner of the calculation of vacation time earned prior to the 90th day before the filing of the Petition which represents the portion of the vacation pay claims to be paid pro rata along with other general unsecured claims.

The Trustee asserts that the Labor Agreement and the Debtor's practices mandate that vacation time is calculated based upon the individual employee's hire or anniversary date, and that each employee is only entitled to vacation pay earned between his anniversary date in 1990 and the January 29, 1991 Petition date.

The USWA asserts that all vacation was earned on a calendar year basis, and that the employees were entitled to a full year of vacation pay as of January 1, 1991.

The pertinent provisions of the Labor Agreement provide:

SECTION 12. VACATIONS

A. Eligibility

1. To be eligible for a vacation in any calendar year during the term of this Agreement, the employee must:

(a) Have one (1) year or more of continuous service; and

(b) Not have been absent from work for six (6) consecutive months or more in the preceding calendar year; except that in case of an employee who completes one (1) year of continuous service in such calendar year, he shall not have been absent from work for six (6) consecutive months or more during the twelve (12) months following the date of his original employment; provided, that an employee with more than one (1) year of continuous service who in any year shall be ineligible for a vacation by reason of the provisions of this paragraph as a result of an absence on account of layoff or illness shall receive one (1) week's vacation with pay in such year if he shall not have been absent from work for six (6) consecutive months or more in the twelve (12) consecutive calendar months next preceding such vacation.

2. Continuous service shall date from:

(a) the date of first employment at the plant; or

(b) subsequent date of employment following a break in continuous service, whichever of the above two dates is the later. Such continuous service shall be calculated in the same manner as the calculation of continuous service set forth in Section 13—Seniority—of this Agreement.

3. An employee, even though otherwise eligible under this Subsection A, forfeits the right to receive vacation benefits under this Section if he quits or he is discharged or his continuous service is broken pursuant to Section 13–C—Seniority—prior to January 1 of the vacation year.

B. Length of Vacation and Vacation Pay.

1. An eligible employee who has attained the years of continuous service indicated in

the following table in any calendar year during the continuation of this Agreement shall receive a vacation corresponding to such years of continuous service as shown in the applicable following table:

| Years of Service | Weeks of Vacation |
| --- | --- |
| 1 but less than 3 | 1 |
| 3 but less than 8 | 2 |
| 8 but less than 12 | 3 |
| 12 or more | 4 |

C. The Vacation earned under this Section 12 shall not be accumulated from year to year, but must be taken, if at all, prior to the end of the calendar year at such time as the Employer shall designate with due consideration being given to the wishes of the employee, his length of continuous service and the needs of the business.

Section 12(A)(3) demonstrates that it was calendar year service which controlled, as a termination of employment before the end of the calendar year led to forfeiture of vacation benefits.

The practice established by the Debtor is consistent with an interpretation that vacation was earned based upon prior calendar year service, and was not tied to the anniversary date of employment. Diann O'Dell was one of the Debtor's employees responsible for administering records concerning payroll for hourly employees. Ms. O'Dell was deposed on May 11, 1992. Her deposition has been made a part of the record in this proceeding. Ms. O'Dell stated that vacation could be taken at any time during the calendar year, except in those years in which the employee was entitled to an additional week's vacation because of the number of years of accumulated service. In such circumstances, the additional week could not be taken until the anniversary date.

The Debtor's policy was that if an extra week's vacation was taken in anticipation of reaching an anniversary which, under the Labor Agreement, would entitle the employee to an additional week, and termination of employment occurred before the anniversary date, the Debtor deducted from the employee's final paycheck the equivalent pay for that extra week. However, for other vacation time earned and taken prior to the employee's anniversary date, no deduction was made from the employee's final paycheck if he was terminated prior to his anniversary date.

Section 12A defines eligibility for a vacation. The first requirement is one or more years of continuous service. § 12(A)(1)(a). The second requirement is that the employee was present at work for at least six consecutive months in the previous calendar year. § 12(A)(1)(b). The anniversary date of employment is only relevant when an employee reaches a seniority level which entitles him to an additional week of vacation. § 12(B)(1). Both under the Labor Agreement and the Debtor's practices, vesting of the entitlement to vacation pay occurred on the first day of the new calendar year, while the vacation pay was earned by service in the prior calendar year. *See In re Northwest Engineering Co.,* 863 F.2d 1313 (7th Cir.1988). Thus, as of January 1, 1991, the Debtor's employees' right to vacation pay for the year 1991, based upon their 1990 service, became absolute and the Debtor became obligated for the full year's vacation pay.

The Trustee and the USWA agree that one-fourth of the vacation pay claims are entitled to priority under 11 U.S.C. § 507(a)(3). The balance is a general unsecured claim.

### III. Meal Allowance (Claim No. 828)

■ The Labor Agreement provides at Section 11, paragraph G:

G. The Employer shall furnish a meal (maximum cost—$3.50) in the plant to an employee who is scheduled for eight (8) hours of work and who worked more than ten (10) consecutive hours with the consent of or at the direction of the Employer.

While operating the Steel Division, the Trustee elected not to comply with this provision. Claim No. 828 represents a postpetition administrative claim in the amount of $760.40 on behalf of several employees who worked the required hours but have not received payment of the meal allowance.

We view this allowance as a part of the employees' wage package under the Labor Agreement. The Trustee elected to receive the services and is obligated to pay the rea-

sonable value of those services. Just as the Trustee must pay wages for services rendered, the Trustee is obligated for payment of the meal allowance. Claim No. 828 will be allowed as filed.

## IV. Conclusion

Claim No. 731 is superseded by Claim No. 829 and will therefore be disallowed.

Claim No. 828 for meal allowances will be allowed as filed.

Claim No. 829 will be allowed in the amount of $168,149.50 and is a § 507(a)(3) priority claim to the extent of ¼ of the claim or for 90 days of vacation pay to the extent of $2,000 for each individual. The claims of individual employees who filed individual proofs of claim for vacation pay which are included in Claim No. 829 will be disallowed.

Claim No. 831 for severance pay will be allowed in the amount of $344,740.12. The portion of severance pay earned during the Trustee's operation of the estate, determined by the formula—156/total days' service × total severance claim—is a postpetition administrative expense under § 503. The portion of the severance pay claim earned within 90 days of the date of filing (90/total days' service × severance pay claim) is a § 507(a)(3) priority claim, in addition to wages and vacation pay, up to $2,000 per person. The balance of the severance pay claim is a general unsecured claim. To the extent any individual employees included in this claim filed a separate proof of claim for severance pay, the individual claims will be disallowed.

An appropriate Order will be entered.

## ORDER

This 23rd day of May, 1994, in accordance with the accompanying Opinion, it shall be, and hereby is, ORDERED as follows:

1. Claim No. 731 is disallowed.

2. Claim No. 828 is allowed as a § 503 administrative claim in the amount of $760.40.

3. Claim No. 829 is allowed in the amount of $168,149.60. One-fourth of the total is a priority claim under § 507(a)(3) and the remainder is a general unsecured claim.

4. Claim No. 831 is allowed in the amount of $344,740.12. A portion of the claim determined by the formula—156/total days' service × total severance claim for each employee—is an administrative claim under § 503. An additional portion of the severance claim determined by the formula—90/total days' service × total severance claim for each employee, not to exceed (together with any other priority claim of such employee) the sum of $2,000—is a priority claim under § 507(a)(3). The balance of the claim is a general unsecured claim.

5. To the extent that claims 828, 829 and 831 are duplicative of claims filed by individual employees, the individual employees' claims are disallowed.