In re SHARON STEEL CORPORATION, et al., Debtor.

METROPOLITAN LIFE INSURANCE CO., Movant,

v.

SHARON STEEL CORPORATION, United Steelworkers of America and Citibank, N.A., as Agents, Respondents.

Bankruptcy No. 92–10958.

United States Bankruptcy Court,
W.D. Pennsylvania.

Jan. 3, 1994.

Herbert P. Minkel, New York City, for debtor.

William H. Schorling, Pittsburgh, PA, for Citibank, N.A., as Agent for Various Bank Lenders.

Philip E. Beard, Pittsburgh, PA, for Official Committee of Unsecured Creditors.

Richard E. Gordon, Pittsburgh, PA, for United Steelworkers of America.

Alan R. Lepene, Cleveland, OH, for Metropolitan Life Ins. Co.

Alexandra Margolis, New York City, for Mueller Industries, Inc.

## REQUEST BY METROPOLITAN LIFE INSURANCE COMPANY FOR PAYMENT OF ADMINISTRATIVE EXPENSE

WARREN W. BENTZ, Bankruptcy Judge.

### OPINION

#### Introduction

Before the Court is Metropolitan Life Insurance Company's ("MetLife") Request for Payment of Administrative Expense ("Request") and the objections to the Request filed by Sharon Steel Corporation ("Debtor"), Mueller Industries, Inc. ("Mueller") and Citibank, N.A., as agent for the Bank Lenders ("Citibank"). After consideration of the Request, the Debtor's Response in Opposition to the Request, the Objections of Mueller and Citibank, Metlife's Memorandum in Support of its Request, Citibank and Mueller's Joint Memorandum of Law in Opposition to MetLife's Request, the Debtor's November 3, 1993 letter requesting delay and MetLife's November 10, 1993 letter in response, the Reply of MetLife to Citibank and Mueller's Joint Memorandum of Law, the Debtor's Supplemental Response, MetLife's Reply to Debtor's Supplemental Response, Mueller's December 3, 1993 letter and Citibank's December 10, 1993 letter, we find that the matter is ripe for decision.

#### Factual Background

In July, 1991, the Debtor and MetLife entered into a group insurance policy (the "Policy") to provide life and accidental death and dismemberment insurance for the Debtor's employees and retirees. The Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code on November 30,

1992 (the "Filing Date"). Prior to the Filing Date, the Debtor failed to remit its November premium payment on the Policy. The premium for November 1 through November 29 remains unpaid and MetLife is entitled to a general unsecured claim for that portion of its premium. Postpetition, the Debtor failed to pay the Policy premiums due for November 30, 1992 and the months of January—August, 1993 except for a partial payment of $53,294.84 in April, 1993 attributable to pre–1987 retirees and an additional payment of $53,000 in July, 1993. The Debtor has accumulated a significant postpetition arrearage.

On March 3, 1993, MetLife filed its Motion for Determination That Automatic Stay is Inapplicable or to Lift Automatic Stay and/or For Order Determining Contract Termination for Nonpayment of Premiums or Compelling Assumption or Rejection of Executory Contract ("Motion"). In effect, MetLife sought either that the Debtor pay the premiums due under the Policy or relief from the automatic stay so that it could terminate the coverage.

The Debtor and the United Steelworkers of America ("USWA") objected to the Motion. Hearings were held on June 7, June 30, and July 21, 1993. While admitting that it had no ability to assume the Policy and bring the premium payments current, the Debtor stated that it had funds to pay the portion of the premium attributable to pre–1987 retirees which are funded by a third-party. As to the balance of the premiums, the Debtor "anticipated that under the terms of a plan of reorganization, [the Debtor] would be able to assume the [Policy]." The USWA shared the position that MetLife could be compelled to continue to provide insurance coverage until a plan of reorganization is confirmed without any assurance that MetLife could eventually be paid. The Debtor affirmatively opposed the Motion claiming that continuation of the Policy was necessary while the Debtor negotiated with the USWA over voluntary modifications to the USWA's Collective Bargaining Agreement with such modifications being necessary to enable the Debtor to formulate a plan of reorganization.

After allowing some time for the Debtor to negotiate with the USWA and to seek replacement coverage for the pre–1987 retirees, by Order dated July 22, 1993, we directed that the Debtor pay MetLife one month's premium ($53,290) within 7 days and granted MetLife relief from stay effective August 20, 1993 to terminate the Policy, unless by that date, the Debtor had cured its delinquencies. The Debtor failed to cure the delinquencies and the Policy was terminated on August 20, 1993.

On September 13, 1993, MetLife filed its Request. MetLife seeks payment of $345,-427.42 as an administrative expense under 11 U.S.C. § 503(b)(1)(A) for the unpaid premiums due under the Policy for the postpetition period from November 30, 1993 through August 20, 1993. MetLife asserts that the premiums due arose from a transaction with the debtor-in-possession; that MetLife's postpetition performance under the Policy provided a direct benefit to the bankruptcy estate; that the amount claimed due, $345,427.42, is supported by adequate documentation; and that under 11 U.S.C. § 506(c), the cash collateral of Mueller and Citibank (collectively, the "Secured Lenders") should be used as a source of funds for the immediate payment of MetLife's administrative claim because the Secured Lenders have assumed control of the Debtor's affairs and have utilized the bankruptcy process to liquidate their collateral for their own benefit.

The Debtor asserts that the rights and obligations under the Policy arose prepetition and, therefore, MetLife's claim did not arise from a transaction with the debtor-in-possession and that MetLife's performance did not confer a benefit on the Debtor. The Debtor further asserts that if an administrative claim exists, it need not be paid prior to confirmation of a Chapter 11 plan of reorganization.

The Secured Lenders object to payment out of their cash collateral. They further assert that the validity of MetLife's claim has not been established and that there can be no present payment to MetLife as it has not been demonstrated that there exist sufficient assets to pay administrative claims in full.

### Issues

1. Whether MetLife is entitled to administrative priority for the amount of its unpaid postpetition premiums?

2. Whether the Secured Lenders' cash collateral can be used to satisfy MetLife's request for payment of an administrative expense?

## Discussion

### I. Administrative Priority

■ The parties agree that in order to be entitled to an administrative expense priority, a creditor must establish that the debt (1) arises from a transaction with the debtor-in-possession, and (2) benefits the bankruptcy estate. *See In re Jartran, Inc.,* 732 F.2d 584 (7th Cir.1984); *In re Mammoth Mart, Inc.,* 536 F.2d 950 (1st Cir.1976). The parties disagree on whether this test has been satisfied.

"[A] debtor receiving necessary benefits from a prepetition executory insurance contract must accord the nondebtor party an administrative expense priority for the pro rata share of the premium, during the period in which the estate received benefits from the contract." *In re Gamma Fishing Co., Inc.,* 70 B.R. 949 (Bankr.S.D.Cal.1987). In reaching that conclusion, the Court reasoned as follows:

> Requiring a debtor to reasonably compensate for the value of post petition benefits received pending the assumption or rejection of a pre petition executory contract for insurance is in furtherence with the equitable objectives of the bankruptcy court. When the debtor filed its petition, the automatic stay imposed by 11 U.S.C. § 362(a)(3) served to prevent Cutri from terminating the agreement even though the debtor was in default. The debtor's right to receive the benefit of insurance coverage continued until either the contract was rejected, assumed, expired on its own terms, or Cutri was granted a relief from stay pursuant to 11 U.S.C. § 362(d). The debtor was under no time restrictions in which to reject or assume the contract and could have received post petition benefits until the contract expired on its face. Allowing the debtor to escape full liability for these post petition benefits would impose a harsh inequity upon Cutri. *See, In re Nordyke,* 43 BR 856, 863 (Bankr.D.Or. 1984). (footnotes omitted)

*Gamma,* 70 B.R. at 954–55.

The Debtor cites *In re Jartran, supra,* to support the assertion that MetLife is not entitled to an administrative expense claim because "MetLife received no new additional inducement from Sharon Steel as a debtor-in-possession to perform in the post-petition period." In *Gamma,* upon consideration of a prepetition insurance policy, the Court distinguished *Jartran,* which concerned a prepetition agreement for the placement of classified advertisements in various directories:

> Due to the peculiar nature of the directory industry, the placement of classified ads were irrevocable six months before the publication date. The six month cut-off date became effective *before* the petition was filed. The *Jartran* court, in denying the creditor's request for an administrative expense priority, repeatedly underscored in its opinion that the key fact in its decision was the irrevocable commitment resulting in the trustee's inability to "elect" to receive or reject the benefits under the contract after the filing of the petition. The court's emphasis on "election" implies that the rationale behind § 503(b)(1)(A) is not solely to protect creditors who extend credit to the debtor after the filing of the petition, but may as well protect pre petition creditors who provide benefits to the estate pending assumption or rejection of an executory contract.

*Gamma,* 70 B.R. at 954.

■ Here, the Debtor elected to continue to receive the benefits under the Policy pending its decision to assume or reject. Accordingly, the obligation arises from a transaction with the debtor-in-possession and the Debtor has an obligation to pay the premiums as an administrative expense.

■ The Debtor now asserts that MetLife's performance did not confer a benefit on the bankruptcy estate. Yet, at the time MetLife sought to cancel the coverage, the Debtor affirmatively opposed the cancellation. The Debtor previously argued that postpetition continuation of the Policy was necessary in order to allow negotiations to

continue with the USWA over a voluntary modification to the Collective Bargaining Agreement which was necessary to formulate a plan of reorganization.

The Debtor not only willingly accepted the benefits of the entire Policy, but fought to retain the coverage. Keeping the Policy in force assisted the Debtor in negotiations with the USWA and in development of a plan of reorganization—a direct benefit to the bankruptcy estate.

The Debtor has evinced a desire to play it both ways—to compel MetLife to continue the coverage and then refuse to pay the premiums claiming no benefit to the estate. We will not condone such desires. MetLife is entitled to an administrative claim based on the total number of persons covered by the Policy regardless of how such individuals are categorized by the Debtor.

The Debtor also disputes the amount of MetLife's claim. MetLife's calculations include an increased premium for July and August, 1993. The Policy fixed the rate of premium for two years from July 1, 1991 through June 30, 1993. After MetLife reviewed its claim experience rate, it advised the Debtor that the basic premiums for periods after July 1, 1993 would increase. The Debtor could have elected to terminate the Policy. Instead, the Debtor elected to continue its efforts to compel continued coverage despite the increase in premium. After review of MetLife's documentation (which the Debtor provided to MetLife) and the Debtor's calculations with an allowance for the increase in premiums for July and August, we find that MetLife is entitled to an administrative claim in the amount of $345,427.42.

### Payment of the Claim

MetLife relies on 11 U.S.C. § 506(c) for its assertion that immediate payment of its administrative expense claim from the Secured Lenders' cash collateral is appropriate because the Secured Lenders have assumed operating control of the Debtor's affairs and are liquidating their collateral solely for their own benefit.

Section 506(c) authorizes the recovery, from property securing an allowed secured claim, the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the secured creditor. 11 U.S.C. § 506(c).

MetLife points to our Order of April 23, 1993 in support of its assertion that the Secured Lenders have assumed control over the Debtor's affairs and have utilized the bankruptcy process to liquidate their collateral for their own benefit. The Order of April 23, 1993 provided that:

> The Debtor shall cooperate with the secured lenders and limit expenditures to those the secured lenders deem necessary to protect the Debtor's assets.

Under 11 U.S.C. § 363, the use of cash collateral is conditioned upon the secured party's consent or authorization by the Court upon a finding that the secured party is adequately protected. Exercise of this right to consent, as reflected by the April 23, 1993 Order does not give the Secured Lenders "control" of the Debtor. The Debtor has elected to liquidate certain of its excess assets, reduce its obligations to the Secured Lenders and attempt a reorganization of a smaller entity with the remaining assets.

To establish a viable claim under § 506(c), MetLife must prove that the premiums due under its Policy were necessary to the preservation or disposition of the Debtor's assets and that the Policy actually benefitted the Secured Lenders. *See In re McKeesport Steel Castings Co.,* 799 F.2d 91 (3d Cir.1986).

MetLife directs us to *United States v. Boatmen's First National Bank of Kansas City* ("Boatmen's"), 5 F.3d 1157 (8th Cir. 1993), in support of its position that the Secured Lenders' cash collateral can be used to pay MetLife's administrative claim under § 506(c). In *Boatmen's,* the Court held that the Internal Revenue Service could recover postpetition payroll taxes from the secured lender's collateral under § 506(c). There, the secured lender made postpetition loans to the debtor to allow for the continued operation of the debtor's stores to preserve the going concern value in order to maximize the lender's return.

In contrast to the lender in *Boatmen's,* the record in this bankruptcy case contains numerous pleadings which indicate the Secured Lenders' opposition to the use of their cash collateral to fund the resumption of the Debtor's operations.

■ The Secured Lenders' position was not affected by whether the Policy was assumed, rejected or terminated. The Secured Lenders did not insist on continuation of the Policy, object to its termination or object to MetLife's Motion. The status of the Policy during this Chapter 11 case would not have had an effect on the Secured Lenders' legitimate goal of maximizing the recovery on their secured claims. MetLife has not even alleged, and there is no support for the proposition, that the Secured Lenders received any direct benefit from the continuation of the Policy. Absent a benefit to the Secured Lenders, MetLife is precluded from receiving payment from the Secured Lenders' cash collateral.

The likelihood of success of this Chapter 11 case is unknown. Failure is a real possibility. There may or may not be sufficient unencumbered assets to pay all Chapter 11 administrative claims in full. We will therefore decline to order the immediate payment of MetLife's claim. Payment will have to await the confirmation of a Chapter 11 plan or a distribution under Chapter 7 of the Bankruptcy Code.

■ A final note is appropriate. This Court continually reminds counsel that we will treat harshly the accrual of expenses during a Chapter 11 which cannot be paid. Such actions amount to a fleecing of creditors under the auspices of the Bankruptcy Court. Debtor's counsel is cautioned that it should not permit the Debtor to remain in Chapter 11 if the Debtor is accruing administrative expenses that will not be paid at the end of the day.