**In re SHARON STEEL CORPORATION, et al., Debtors.**

Richard L. ARTHUR, William H. Beachler, Mary Grace Blair, Lori A. Darby, Susan L. Generalovich, Carmen P. Giancola, James M. Greer, Richard A. Herman, Ralph W. Huff, Robert A. Kane, Jo Daniel Keeler, James M. Larocca, John H. Schuller, William H. Super, Peter J. Walsh, and Michael A. Yaksich, Movants,

v.

**SHARON STEEL CORPORATION and Citibank, N.A. for Itself and as Agent for Lenders, Respondents.**

Bankruptcy Nos. 92–10958, 92–10959 and 92–10961.
Motion No. PRB–5.

United States Bankruptcy Court, W.D. Pennsylvania.

March 26, 1997.

P. Raymond Bartholomew, Hermitage, PA, for Movants.

Herbert P. Minkel, Jr., Boston, MA, for Debtors.

Amy M. Tonti, Pittsburgh, PA, for Citibank, N.A.

Philip E. Beard, Pittsburgh, PA, for Official Committee of Unsecured Creditors.

United States, Trustee, Pittsburgh, PA.

## OPINION [1]

WARREN W. BENTZ, Bankruptcy Judge.

### Introduction

On November 30, 1992 ("Petition Date"), Sharon Steel Corporation ("Debtor") filed its voluntary Petition for relief under Chapter 11 of the Bankruptcy Code. Citibank, N.A. for itself and as Agent for Lenders ("Citibank") holds a security interest in substantially all of the Debtor's assets. As of the Petition Date, Citibank was owed approximately $77,000,000. Citibank's claim has been reduced over the course of the bankruptcy, but has not yet been paid in full. The Movants served as employees of the Debtor during the postpetition period until the Debtor's main facility was sold to Caparo Steel Company ("Caparo") on or about November 30, 1994. During the postpetition period, the Movants were paid all of their wages, holiday pay, vacation pay and, in one instance, paid maternity leave. Other benefits such as severance pay, health, prescription, dental, vision, and life insurance (collectively, the "Fringe Benefits") were not paid. Movants seek payment of the postpetition Fringe Benefits as an administrative expense from the Debtor's estate and as a § 506(c) [2] claim against Citibank. The Debtor, Citibank, and the Official Committee of Unsecured Creditors ("Committee") oppose the relief requested. An evidentiary hearing was conducted over a period of two days and the matter is now ripe for decision.

---

**1.** This Opinion constitutes this Court's findings of fact and conclusions of law.

**2.** All code sections refer to Title 11 of the United States Code, unless otherwise indicated.

### General Background

Prior to the Petition Date, Citibank had curtailed the amount of its advances to the Debtor. Debtor had ceased operation of its steel-making facilities. Health benefits had been terminated for non-payment of premiums. Shortly after its bankruptcy filing, Debtor sought the use of Citibank's cash collateral to restart operations. An initial hearing was held on December 2, 1992. The hearing was followed by an Order dated December 7, 1992 which authorized the Debtor to make certain specific expenditures from Citibank's cash collateral including:

.     .     .     .     .

(c) a disbursement to Mutual of Omaha Insurance Company and other health benefit administrators in the amount of $50,-000 as the start-up and administration cost for processing retiree and active health benefit claims;

(d) a disbursement to Greenwood Pharmacy or its successor of an additional $25,000 for the Debtors' prescription drug program;

(e) a disbursement to Metropolitan Life Insurance Company to maintain life insurance coverage for active employees and retirees;

(f) disbursements for wages to engage plant guards, firewatch personnel, and other necessary office personnel and staff, and related wage taxes and costs for the postpetition work and related expenses . . .

In the same Order, Citibank was provided adequate protection:

.     .     .     .     .

4. As adequate protection pursuant to Sections 363 and 361 of the United States Bankruptcy Code, the prepetition liens of Citibank, N.A. as agent for the bank lenders shall continue postpetition and the prepetition liens of Citibank, N.A. as agent for the bank lenders shall continue in property acquired by the estates or the Debtors after the commencement of the cases.

Following two days of testimony on December 8–9, 1992, the Court declined to allow the Debtor the full use of Citibank's cash collateral:

My temporary conclusion, as I'm required to make under the code, is that we stay the way we are. The outstanding Order will be continued. I will not make an Order for—at this time for the—on a temporary basis for the company to reopen and recommence operations. That doesn't mean that I won't do it on a permanent basis, if we have further hearings or after I consider the evidence further.

But as this juncture my Order will be that the existing Order will stay in effect. Which simply means that the utilities will be paid and certain employees will be there and the guards will be there and the plant will be protected.

A final hearing on the Debtors' request to use Citibank's cash collateral was held on April 6, 7 and 8, 1993. On April 23, 1993, an Order was entered which denied the Debtors' request to use cash collateral and further provides that "[t]he Debtor shall cooperate with the secured Lenders and limit expenditures to those the secured Lenders deem necessary to protect the Debtors' assets."

The Debtor has been in the process of liquidating its assets since that time.

### Positions of the Parties

#### A. Movants

Movants assert that although they received their postpetition salaries, holiday pay and vacation pay, they did not receive the promised Fringe Benefits which were set forth as part of the Debtors' prepetition policies. The Movants assert that the Fringe Benefits were incidental to their employment and that management represented they would continue postpetition. The Movants further assert that their service was necessary to the preservation and disposition of Citibank's collateral and that the services provided a direct benefit to Citibank.

#### B. Debtor/Committee

The Debtor asserts that the Fringe Benefits were not a term and condition of the Movants' postpetition employment. The Debtor posits that the various medical benefits were terminated prepetition and that there was no promise that they would be

restored. Similarly, the life insurance policy was terminated shortly after the Petition Date and payroll deductions for life insurance premiums ceased in January, 1993. Therefore, Debtor asserts that the Movants voluntarily chose to continue their employment without such benefits and that their claim must be refused both as an administrative claim under § 503 and as a § 506(c) claim.

The Debtor asserts that there is no evidence that a severance policy was in existence prepetition and that no promise was made to pay severance postpetition; that if a severance policy existed, it was not paid when an employee left for other employment; that the Movants left for other employment and are not eligible for severance. The Debtor further asserts that if the Movants are entitled to severance pay, they have ·incorrectly calculated the amounts. The Committee asserts that the Movants' claims must be apportioned between pre- and postpetition claims.

Finally, Debtor has asserted that the Movants lack standing to assert a § 506(c) claim and that the services provided by Movants did not provide the necessary benefit to qualify for § 506(c) treatment.

### C. Citibank

Citibank asserts that the Movants' Fringe Benefits were canceled prepetition and if they were not canceled prepetition, the amount must be apportioned between prepetition and postpetition claims. Citibank further asserts that the Movants' claims are not entitled to § 506(c) treatment because there was no direct benefit beyond the wages paid to the Movants and Citibank did not consent to the payment of Fringe Benefits. Finally, Citibank asserts that any allowed § 506(c) claim must be paid from the § 506(c) fund established by this Court's Order of February 15, 1995 and that any § 506(c) payment may not reduce Citibank's claims and must be deemed to have come from that part of the Debtor's estates which constitutes surplus in excess of Citibank's claims.

### Facts

#### A. Witnesses

The Court heard testimony from Movants Greer, Darby, Herman, Walsh, Blair, Giancola, Generalovich, Schuller, Larocca,· Arthur, and Huff. Citibank and the Debtor presented the testimony of Joseph Santarlasci, Jr. ("Santarlasci"), a financial consultant to the Debtor. Also admitted as an exhibit is the deposition testimony of Debtor's former senior vice president, general counsel and secretary, Malvin Sander ("Sander").

#### B. Prepetition Benefit Policy

The Debtor's prepetition policy concerning fringe benefits is set forth in a company newsletter which was distributed to employees. The described benefits include, *inter alia:*

—Life insurance (small payroll deduction)

—Health coverage (comprehensive 80/20 Plan with $400 deductible and maximum out of pocket expense of $1,000)

—Dental (percentage of usual, reasonable and customary charge (100%, 85%, and 50%) and maximum of $1,000 per year per insured

—Vision (eye exam, lens and frames—once every two or. more years—a portion of charges is paid)

—Prescription (mail order program—$5.00 per prescription—generic drugs)

The severance policy ("Severance Policy") for salaried employees is dated May 16, 1988. It provides, in relevant part:

I. *OBJECTIVE*

    A. To provide salary/income continuance to terminated employees while they seek alternative employment.

    .    .    .    .    .

II. *POLICY*

    A. Severance pay will be provided only when the employee is involuntarily terminated due to elimination of the employee's assignment and no comparable new assignment is available and offered within the employee's commuting range.

    B. Severance pay will not be provided if the employee resigns or is termi-

nated for cause. Terminations for cause include terminations for repeated occurrences of grossly inadequate performance.

## III. SEVERANCE BENEFIT

An eligible terminated Employee's severance benefit will equal one week's salary for each full year of service. The maximum severance benefit is ten weeks' salary. There will be no proration for a partial year of service. The minimum severance benefit an eligible terminated employee will receive is two weeks' salary.

.        .        .        .        .

## VI. ADMINISTRATION AND AMENDMENT

The Company, as the Administrator of this severance benefit, reserves the right, with appropriate notice to employees, to mend (sic) or terminate the Plan.
VII. This policy is *not* applicable to officers of the Company, elected or appointed.

Officers of the Debtor were provided a different severance benefit based on a document entitled OFFICER TERMINATION ALLOWANCE SCALE which provided for a severance benefit calculated according to the employee's age and years of service at termination. Regarding the officer termination allowance, an inter-office communication dated May 10, 1989 states:

Individual circumstances may dictate a deviation from the scale attached; however, in all cases, the Executive Vice President and Chief Operating Officer's final approval will be required in determining applicable termination allowance.

### C. Health Care Coverage

The Debtor's health care insurance carrier, Blue Cross/Blue Shield ("Blue Cross") notified the Debtor by letter dated November 5, 1992 that it would no longer provide health care coverage to the Debtor due to non-payment of premiums. Blue Cross agreed to pay claims through October 31, 1992 and stated that it would issue conversion applications to all eligible employees to enable them to obtain coverage on a direct payment basis effective November 1, 1992.

Shortly after the Petition Date, Debtor sought permission to use cash collateral. Management fully expected that it would be allowed to use cash collateral to restart operations and that it would be able to provide health care coverage. The December 7 Order allowing certain specific disbursements was not an authorization to provide health care coverage. As stated at the hearing, the payment to Mutual of Omaha was not to process claims, but to enable them to set up to begin processing claims once the court authorized claims to be processed, after the use of cash collateral was approved. Likewise, the $25,000 one-time payment to a pharmacy was to cover only a one-week period until a further cash collateral hearing could be held.

A further hearing was held on December 8–9, 1992 and the Debtor's request to use cash collateral was denied on an interim basis. Further hearings were scheduled in February, 1993.

Meanwhile, the deadline for conversion to personal, employee-paid, Blue Cross coverage was January 29, 1993. On January 14, 1993, Debtor issued a memorandum to its employees which stated that it had tried to obtain the use of cash collateral to provide health insurance coverage, but was unable to obtain Citibank's consent or court authorization. The Debtor arranged meetings where employees could meet with various health care providers to provide short-term alternative coverage that the employees could purchase on their own so that they would not be left without any coverage at all. Some of the Movants purchased alternative coverage and some were able to obtain coverage through their spouse's employment. At this time, the purchased coverage was thought to be short-term as further cash collateral hearings were scheduled and management still expected to restart operations and once again be able to fund health care premiums. Movants were advised to keep an accurate record of their expenditures so that the Debtor could attempt to get them paid. Management expressed a hope that the employees could be reimbursed once authorization to use cash collateral was obtained or through the claims process in the Bankruptcy Court. There was

no promise by management that the employees would be reimbursed or that health care coverage would be reinstated.

Following the April, 1993 hearings on the use of cash collateral, and the Court's April 23, 1993 Order, the Debtor was in a liquidation mode. Citibank continued to refuse to fund health insurance benefits. Debtor's management continued to promise to try and restore benefits. The employees continued to express concern over the availability and cost of privately purchased insurance. In an effort to alleviate the problem, the Debtor asked Blue Cross to establish a group plan which would be self funded by interested employees. Certain employees, including Movants Beachler, Giancola, Greer, Kane, Larocca, Schuller, Walsh and Yaksich expressed interest in such a plan. Blue Cross was able to accommodate the Debtor. Effective April 1, 1994, the employees were able to purchase Blue Cross coverage. Movants Generalovich, Giancola, Larocca, and Walsh were among the employees who elected to participate. In connection with the election, the participants signed a SALARY DEDUCTION AGREEMENT authorizing the Debtor to deduct the cost of the insurance premiums from their salaries and acknowledging an understanding that revocation of the payroll deduction authorization would result in a termination of benefits.

The Movants now seek reimbursement for premiums paid for health insurance and for out-of-pocket medical expenses incurred due to a lack of insurance coverage.

## D. Life Insurance

Movants Arthur, Darby and Huff seek reimbursement for life insurance premiums for insurance they purchased individually to replace the coverage previously provided by the Debtor.

Metropolitan Life Insurance Company ("Met Life") provided group life insurance for the Debtor's employees. The employees were required to contribute to the cost of the coverage by way of payroll deduction. The last payroll deduction for life insurance was made in December, 1992. The Debtor lacked funding to pay the insurance premiums. As with the health insurance, Debtor's ability to provide life insurance was contingent upon approval of the use of cash collateral to restart operations.

Although the Debtor ceased payroll deductions for life insurance after December, 1992, and stopped making premium payments to Met Life, the policy remained in effect until August 20, 1993, pursuant to Court Order allowing Met Life to terminate the policy. *In re Sharon Steel Corp.*, 161 B.R. 934 (Bankr.W.D.Pa.1994).

## E. Severance

The Movants each claim two weeks' severance pay, one for each year that they worked postpetition based upon the Severance Agreement which provided for a severance benefit of one week for each year worked up to a maximum of ten weeks.

Sander, as General Counsel, Secretary and Chief Operating Officer, testified that to the best of his knowledge, the Severance Policy was never rescinded and that the entitlement of an employee would be based upon a legal determination by the Bankruptcy Court.

Movants Arthur, Blair, Generalovich, Giancola, Greer, Herman, Huff, Larocca and Walsh worked more than ten years prior to the Petition Date. Movants Blair, Darby, Generalovich, Giancola, Greer, Herman, Huff and Walsh were immediately employed by Caparo upon their termination of employment with the Debtor at the same or a higher wage. On December 6, 1994, Movant Darby advised Caparo that she, "in essence [was] working out a notice to Sharon ... through December 15th [and that because of] a personal commitment December 16th through December 19th [she] wish[ed] to officially begin ... employment with Caparo Steel on December 20th."

It was the Debtor's policy during the postpetition period to place employees on indefinite layoff status regardless of whether or not they left voluntarily for the reason that displaced employees were entitled to the continuation of certain government benefits regardless of whether or not they have gone on to other employment. Movants were given notice upon leaving employment that they were placed on indefinite layoff status.

Darby served as an officer of the Debtor. Darby is not seeking enhanced severance benefits pursuant to the officer's severance policy. Under the officer's severance policy, an officer who is seeking severance pay is required to obtain the approval of the Executive Vice President and Chief Operating Officer. When Darby's employment ended, the offices of Executive Vice President and Chief Operating Officer did not exist or were vacant.

The Debtor did not pay any severance benefit postpetition with the possible exception of certain employees who had individually negotiated employment contracts which provided for a severance benefit.

### F.  § 506(c)

Pursuant to our order of December 4, 1992, employees remained on the premises to preserve and protect Citibank's collateral. Following our Order of April 23, 1993, Debtor's operations were limited to the preservation of and liquidation of assets. Citibank was the beneficiary of the funds generated through the liquidation process. Citibank continually monitored the process and the job descriptions and number of employees engaged by the Debtor to complete the process. The postpetition service of each of the Movants directly contributed to the preservation and/or disposition of Citibank's collateral.

Each of the Movants described his or her job responsibilities. Greer was the general manager of the finishing division. During the liquidation process, Greer located, transported and shipped inventory, winterized equipment, inventoried and helped sell various supplies, helped dispose of hazardous wastes, worked on roofs and did repairs.

Darby was involved in the due diligence process with various entities interested in purchasing the facility, including the buyer, Caparo.

Herman was the Director of Environmental Control. During the liquidation phase, he continued to maintain the environmental program which involved maintaining permits and compliance with reporting requirements.

The permits were kept in an active state to lead to a smooth transition to a new buyer.

Walsh was the manager of production control. He worked with persons hired to liquidate the steel inventory and discussed operations with potential buyers of the business, including Caparo. He also gave reports on the status of the inventory liquidation to Wigton who was hired by Citibank to oversee the liquidation.

Blair served as a legal secretary. She performed all of the duties required by Sander who was in charge of the liquidation effort.

Giancola served as director of safety and security. His duties were to ensure the safety of the personnel, the steel remaining at the facilities and the facilities themselves. He worked with insurance companies to keep everything at low risk for the potential of fire, explosions, etc. Giancola also reported on the progress of the liquidation to Wigton.

Generalovich was the manager of order entry. Postpetition, she designed a program for the sale of inventory and to get the paperwork processed to sell the assets. She produced invoices to customers and collected the accounts receivable which went to Citibank.

Schuller served as general manager of transportation. He assisted in locating the steel inventory, identifying it, worked with customers buying the steel, arranged transportation, loaded the steel and made shipment.

Larocca was the manager of computer systems. He recovered data for all of the inventory systems from the main frame computer, reformatted it, and built an application system on a pc network to keep track of inventory and the cost of inventory. The data was used to keep track of the chemistry, grade and analysis of inventory to facilitate its sale.

Arthur was employed as captain of security. He served as a plant guard but also performed other functions postpetition. He maintained pumps, rotated generators, moved cranes to keep them operational, repaired broken water lines, repaired roofs and helped winterize equipment. Arthur is the only Movant who was an hourly union em-

ployee. All of the other Movants were salaried employees.

Huff was the foreman of engine repair. He maintained water lines, fire systems and pumps to keep them operational and to prevent flooding. He also made repairs to water lines to reduce water usage from 1,400 gallons per minute to 100 gallons per minute.

Sander testified that each of the Movants was involved in the preservation of Citibank's collateral and that, with the exception of Arthur and Giancola, each Movant was involved in a component of the liquidation of the estate.

## Discussion

### A. § 506(c) Claim

11 U.S.C. § 506(c) provides:

(c) The Trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Individual creditors have standing to bring a § 506(c) claim as if they were in the shoes of the Trustee. *In re Mall At One Associates, L.P.*, 185 B.R. 981, 987 (Bankr. E.D.Pa.1995) *citing In re Visual Industries, Inc.*, 57 F.3d 321, 325 (3d Cir.1995); *see also In re McKeesport Steel Castings Co.*, 799 F.2d 91 (3d Cir.1986).

To recover expenses under § 506(c), a claimant must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a direct benefit to the secured creditors. *In re C.S. Associates*, 29 F.3d 903, 906 (3d Cir.1994); *see also Visual Industries* at 325–26.

The payroll of employees directly and solely involved with the disposition of a secured creditors' collateral are expenses which are directly related to disposing of or preserving the creditors' collateral. *Visual Industries* at 325.

Movants all contributed to the postpetition preservation and liquidation of the collateral for the direct benefit of Citibank. Citibank closely monitored their activities and made

sure that only those employees who were absolutely necessary to the liquidation process remained on the Debtor's payroll.

The Movants are entitled to recover from Citibank or from Citibank's collateral as a § 506(c) expense whatever they are due under the terms of their employment.

### B. Health Insurance

The Movants' health care coverage was terminated by Blue Cross prepetition. The Debtor and the Movants both believed at that time that health care coverage was incidental to the Movants' employment and that following the filing of the bankruptcy Petition, the Debtor would be able to obtain the use of cash collateral and restore health insurance benefits retroactive to the date of the Blue Cross cancellation. The Debtor was unsuccessful in its first attempt to use cash collateral at the December, 1993 hearing and Citibank refused to fund health insurance premiums. As the final date for conversion from group to individual coverage under the Blue Cross plan approached, it became apparent to all parties that the Debtor could not obtain the use of cash collateral by January 29 given that a further hearing on the use of cash collateral was not scheduled until early February. The Debtor arranged meetings between its employees and various insurance providers where the employees could purchase "short-term" coverage until the Debtor could obtain the use of cash collateral and once again provide coverage. The employees were advised to keep track of their expenditures with the hope that they could be reimbursed. All parties still considered health insurance coverage incidental to employment and fully expected that health insurance coverage would be reinstated once the Debtor recommenced operations. The February hearings were continued to April and following the Court's Order of April 23, all parties knew that the Debtor was going to liquidate; that Citibank refused to provide health care coverage; and that any coverage would have to be funded by the employees.

While the Debtor continued to indicate that it was working on obtaining coverage

and the consent of Citibank to provide such coverage, everyone knew that health insurance coverage was no longer available as a Fringe Benefit because Citibank refused to provide funds for the coverage and without funds, the Debtor was unable to provide it.

We conclude that health insurance coverage ceased to be a term of the Movants' employment prior to the Filing Date. The Movants knew that health insurance coverage had been canceled and was not available. It was no longer a term of their employment. They chose to continue their employment without the benefit of health insurance coverage with a "hope" that it could be reinstated and that they might be reimbursed for out-of-pocket health care expenses. The Movants have no § 506(c) or § 503 claim for health care coverages.

### C. Life Insurance

■ A similar analysis applies to life insurance coverage. The life insurance provided by the Debtor required a payroll deduction for the employees' contributory portion of the premium. The Debtor made its final payroll deduction for life insurance in December, 1992 and advised employees that no deduction would be made in January, 1993 or thereafter as it was not able to fund life insurance premiums. Thus, in January, 1993, Movants knew that life insurance was no longer a term of their employment.

The Movants have no § 506(c) or § 503 claim for life insurance premiums.

### D. Severance Benefits

■ The Severance Policy was in effect prior to the Petition Date and the Movants had no reason to believe it did not continue postpetition. Sander testified that the Severance Policy was never rescinded and that an employees' entitlement to severance would be based upon a determination of legal issues by the Bankruptcy Court. Sander stated that the length of service is a factual component of that issue.

Caparo purchased the Debtor's steel-making facility. Each of the Movants seeking severance, other than Schuller and Arthur, a non-salaried employee, accepted employment at the same or higher levels of compensation with Caparo immediately following their last day of employment with the Debtor. Although the Movants who went to work for Caparo were notified that they were placed on indefinite layoff, it was only for the purpose of allowing eligibility for certain government programs for displaced workers. The indefinite layoff status was subsequently crossed off of the forms by Debtor's management.

Under the Severance Policy upon which the Movants rely, benefits were not paid if an employee left for other employment. Severance was only paid if an "employee is involuntarily terminated due to elimination of the employee's assignment and no new assignment is available and offered within the employee's commuting range." The stated objective of the Severance Policy is "[t]o provide salary income continuance to terminated employees while they seek alternative employment."

The Debtor and Citibank assert that those employees who immediately went to work for Caparo are ineligible for severance pay because they suffered no loss of income and were not terminated, but rather left to accept other employment. The Severance Policy is silent as to what happens if the company is sold and the employees are retained by a new buyer.

The noninterruption of work does not invalidate the Movants' entitlement to severance pay. *Ulmer v. Harsco Corp.*, 884 F.2d 98 (3d Cir.1989); *In re Wean, Inc.*, 169 B.R. 126 (Bankr.W.D.Pa.1994) *superseded by In re Wean, Inc.*, 171 B.R. 528 (Bankr.W.D.Pa. 1994); *In re Old Electralloy Corp.*, 167 B.R. 786 (Bankr.W.D.Pa.1994). Although the Movants did not suffer a loss of work, the sale to Caparo terminated the pre-existing relationship between the Movants and the Debtor. The employment with Caparo is with a different entity. Although the Movants received equal or better wages and benefits from Caparo, Caparo did not recognize their seniority.

As we did in *Old Electralloy*, we find that the cessation of the Debtor's operations and the termination of its employment relationship with the Movants upon consummation of

the sale to Caparo triggers the benefits of the Severance Policy.

The Debtor and Citibank assert that the Movants had accrued the maximum ten week severance allowance prepetition. They posit that there was no additional accrual postpetition, and thus there is no postpetition liability for severance benefits. This issue was addressed in *In re Wean, Inc.*, 171 B.R. 528 (Bankr.W.D.Pa.1994) which states:

Both parties cite *In re Roth American, Inc.*, 975 F.2d 949 (3d Cir.1992), in support of their positions. *Roth American* identified two types of severance pay claims: those claims that arise at termination of employment (a) in lieu of notice and (b) based on length of employment. *Id.* at 957. The severance pay in the case at bar is of the second type. Debtor argues that under *Roth American* the severance pay claims have administrative priority only to the extent that entitlement to the amount of severance pay accrued during the postpetition period. By analogy, the argument applies to the priority period as well. We disagree that the right to a specific amount of severance pay must accrue during the priority or postpetition period in order that the claim fall under § 507(a)(1) or (a)(3). *Roth American* holds that severance pay claims "only have administrative priority to the extent that they are based on services provided to the bankruptcy estate postpetition." 975 F.2d at 957. Although there is language in that opinion concerning the timing of the earning of benefits, we do not read it to require that a specific amount of severance benefit must accrue during a priority period; rather, the right to payment at all must accrue at the relevant time. The Court of Appeals pointed out, with respect to § 507 administrative expenses, that § 503 refers to expenses that are actual and necessary to preservation of the estate, including those are incurred in relation to services rendered postpetition. 975 F.2d at 958.

It is undisputed that 125 hourly employees performed services for Debtor in the 90 days prepetition and 120 hourly employees did so until the permanent shutdown. Stipulation of Facts at pp. 4, 5. To the extent that these employees were eligible for severance pay when their employment with Debtor ceased, the severance pay attributable to the postpetition period must be given administrative priority. 11 U.S.C. § 507(a)(1). Similarly, that portion attributable to services performed in the 90 days prepetition falls within the purview of § 507(a)(3). *See In re Jeannette Corp.*, 118 B.R. 327 (Bankr.WDPa.1990); *In re Levinson Steel Company*, 117 B.R. 194 (Bankr.WDPa.1990).

Section 507(a)(3)(A) refers specifically to severance pay claims which are "earned by an individual within 90 days before the date of the filing of the petition or the date of the cessation of the debtor's business, whichever occurs first." Under the collective bargaining agreement in this case, severance pay was not earned unless a plant or department closed and employees lost their jobs. Employment until the permanent shutdown was a necessary step to the right to severance pay. Had an employee left the company before the permanent shutdown, that individual would have lost entitlement to all severance benefits. The shutdown occurred postpetition and the employees whose severance is at issue were all employed until the shutdown, including throughout the priority period. Thus, their entitlement to receive severance benefits arose postpetition, although the amounts of the benefits (for all but two employees) were fixed before 90 days prepetition. [FN4] Entitlement to any severance benefit is governed by the contract. Section 507 merely dictates the order of payment to various classes of creditors.

FN4. Two employees passed the milestone for length of service and gained additional weeks of severance benefits in the 90 days prepetition. Two others did not qualify for additional benefits because their length of service stayed within the same step during and after the priority period.

In summary, portions of severance pay attributable to services performed for Debtor postpetition are entitled to administrative priority under *Roth American*. Portions of severance pay attributable to the 90–day prepetition period are payable with priority to the extent of $2,000 if not

already paid. [FN5] Amounts in excess of the $2,000 priority allowance constitute unsecured claims.

*In re Wean, Inc.*, 171 B.R. at 531–32.

Movants assert that they are entitled to two weeks' postpetition severance benefit, one week for each of the two years worked. Debtor and Citibank assert that the postpetition severance claims must be calculated in accordance with the formula set forth in *In re Old Electralloy*, 167 B.R. 786 (Bankr. W.D.Pa.1984).

In *Old Electralloy*, no employees had reached the maximum plateau for the accrual of severance benefits so that post-petition employment potentially increased the severance amount. We viewed the formula as an appropriate method to determine the pre- and post-petition amounts. The formula is inappropriate here. For example, one of the Movants has been employed 40 years. Debtor and Citibank would have us calculate her postpetition severance allowance as $\frac{2}{40} \times 10$ weeks or ½ week, while someone who had worked 8 years' prepetition and 2 years' postpetition would receive $\frac{2}{10} \times 10$ or 2 weeks severance allowance. Such a result would be contrary to the general concept of rewarding long time faithful employees.

We find that each Movant is entitled to a severance benefit representing a two-week salary figure as an administrative claim. Pursuant to the language of our April 23, 1993 Order, Citibank had control of the Debtor's expenditures. It carefully monitored each dollar the Debtor spent and was intricately aware of the work being performed by Debtor's employees. Citibank knew that, in effect, it was responsible for payment of the employees' compensation package. Health benefits and life insurance had been terminated. However, the severance benefit was not terminated and we think that if Citibank did not intend to make such payments, it was incumbent upon it to investigate the status of the employees' severance benefits and make sure that the employees knew that severance benefits were no longer a condition of their employment. Accordingly, we hold that the severance benefit also qualifies as a § 506 claim against Citibank.

### E. Richard L. Arthur Claim

■ The Debtor and Citibank assert that the claim of Richard L. Arthur ("Arthur") was reclassified by Order dated November 1, 1994 from unsecured priority status to a general unsecured claim. On August 5, 1994, Arthur filed claim number 1707 in the amount of $15,006.21 as an unsecured claim based on an Employee Stock Ownership Plan in the amount of $10,738.63 and an unsecured priority claim for wages in the amount of $763.06. Arthur was not represented by counsel at the time of the objection to his claim in 1994. Arthur asserts that claim 1707 addressed prepetition claims while the claim presently asserted is for postpetition services and that the November 1, 1994 Order has no effect on his current claims. To the extent that the November 1, 1994 Order has any effect on his current claims, Arthur requests reconsideration under Fed. R.Bankr.P. 3008.

Our review of Arthur's prior claim reveals that it was a claim for totally different items than are being claimed now. We do not believe that the reclassification of his prior claim affects his claim for postpetition Fringe Benefits. His claim for health benefits will be treated the same as those of the other Movants.

Arthur's claim for severance pay must be refused. The severance policy presented to the Court is limited to salaried employees. Arthur was an hourly employee. Whether or not Arthur has a severance claim under the terms of a union labor contract is not presently before the Court.

### F. Lori Darby Claim

■ Citibank and the Debtor assert that Lori Darby ("Darby") lacks standing to assert a severance claim because she was a corporate officer of the Debtor, and under the severance policy, she needed approval of certain officers to receive severance pay which she did not obtain. The office of the officers from which she was to obtain approval was not filled at the date of her layoff and therefore it was not possible to obtain such

approval. Darby is not seeking an upward deviation from the usual severance benefit.

We conclude that Darby is entitled to the same severance benefit as the other Movants.

### G. Movants Beachler, Kane, Keeler, Super and Yaksich

The Debtor and Citibank assert that Beachler, Kane, Keeler, Super and Yaksich failed to appear at trial and by reason of their failure to appear, their claims under § 503 and § 506(c) should be dismissed with prejudice.

Movants' counsel advised the Court at the hearing on September 5, 1996 that Beachler, Kane, Keller and Yaksich did not intend to appear and would be withdrawing their claims. Their claims will be dismissed.

Super, however, intended to be present and would like to pursue his claim. Counsel indicated that Super's father's illness prevented him from being present on the day of the hearing.

Super's counsel had assumed Super would be in Court on the day of trial and only learned by facsimile the day before trial that Super would not attend. The trial date was fixed several months in advance. Further inquiry by the Court revealed that Super's father was in the Sharon area, roughly an hour and 15 minutes from the Court, not a great distance from his father. We believe Super could and should have been present.

At the time of the hearing, we afforded counsel an opportunity to reach Super to allow him to present his testimony by telephone. Counsel reported that Super was not in his office and could not be located. Super's claim will be dismissed.

### H. Source of § 506(c) Payment

Citibank asserts that the allowed § 506(c) claim must be paid from the § 506(c) fund established by this Court's Order of February 15, 1995 and that the § 506(c) payment may not reduce Citibank's claims and must be deemed to have come from that part of the Debtor's estates which constitutes surplus in excess of Citibank's claims. The Movants have no interest in the source of the § 506(c) payment so long as it is paid. The Debtor has not addressed this assertion by Citibank and it appears that it may not be an issue. We decline to address the matter at this time. If it later becomes an issue, it can be addressed by separate motion.